**INDUSTRIAL LIFE INSURANCE CO.,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 70–614.**

United States District Court,
D. South Carolina,
Columbia Division.

April 11, 1972.

Harry M. Lightsey, Jr., Columbia, S. C., for plaintiff.

Charles W. Gambrell, Asst. U. S. Atty., Columbia, S. C., for defendant.

### ORDER.

CHAPMAN, District Judge.

This is an action brought by the plaintiff to recover income taxes and interest for the years 1963, 1964 and 1965, which it alleges were erroneously and excessively collected. The total amount of the claim is $41,037.35.

The case presents four basic questions, which are hereinafter answered in the Findings of Fact and Conclusions of Law. These questions are:

1. Whether the plaintiff, during 1963, 1964 and 1965, qualified for taxation as a life insurance company under Section 801, et seq., of the Internal Revenue Code of 1954.

2. Whether plaintiff allowed an unreasonable accumulation of earnings and is subject to the accumulated earnings tax imposed by Section 531 of the Internal Revenue Code of 1954.

3. Whether plaintiff was engaged in the sale of lots in the ordinary course of its trade or business during the years 1963 and 1964, so that any gain resulting therefrom was subject to taxation at ordinary income rates.

4. Whether IRS properly disallowed certain claimed automobile expenses on the grounds that they were not incurred in the conduct of plaintiff's business.

After hearing all testimony, reviewing all exhibits and the various briefs and reply briefs submitted, the Court makes the following

### FINDINGS OF FACT

1. That plaintiff was chartered April 19, 1939, by the Secretary of State for South Carolina under the name of General Insurance Corporation, and through various name changes and amendments to the charter became Industrial Life Insurance Company on September 25, 1956.

2. That the original authorized capital stock of the corporation was $10,000 and that of this amount $2,500 was paid in.

3. That the charter of the corporation empowers it to issue contracts of insurance against all manner of hazards, including sickness, accident, death, casualty and liability, and all other forms of insurance contracts; to buy, sell, mortgage, and lease real estate and to do all things necessary and incident to the above powers.

4. That during 1942 control of the plaintiff corporation was acquired by Clayton Scyphers and his immediate family, who now own all the company stock, constitute its Board of Directors and serve as its officers.

5. That on or about May 20, 1969, the plaintiff paid to the defendant the sum of $41,037.35, being the amount assessed by the defendant as additional income tax and interest due by the plaintiff for the years 1963, 1964 and 1965 as follows:

| | |
|---|---|
| 1963 tax | $13,206.87 |
| Interest | 4,103.20 |
| TOTAL | $17,310.07 |
| 1964 tax | $15,119.87 |
| Interest | 3,768.59 |
| TOTAL | $18,888.46 |
| 1965 tax | $ 4,063.47 |
| Interest | 775.35 |
| | $ 4,838.82 |

6. That plaintiff filed timely claim for refund, after paying such taxes under protest and such claim for refund

was rejected by the defendant. This suit was brought pursuant to the provisions of 28 U.S.C.A. § 1346 for recovery of these amounts.

7. In the early years of the corporation it actively engaged in the business of writing weekly premium insurance. The weekly premium business was disposed of through reinsurance agreements and since 1956 the only insurance sold by the plaintiff has consisted of a credit life insurance policy on the lives of the debtors of Consumer Investment Company, Inc. issued March 1, 1962. This was a master group credit life insurance policy, and separate policies were not issued by the plaintiff to the individual debtors. Only debtors below the age of 65 years were covered. The maximum amount on one debtor was $2,000 and the length of the indebtedness could not exceed 36 months.

8. The evidence shows that there were from one thousand to twelve hundred debtors insured from time to time under this blanket policy and the average loan insured was approximately $250.

9. The premium income resulting from this credit life insurance blanket policy was $2,572.46 in 1963, $3,517.56 in 1964 and $3,423.92 in 1965.

10. During the years 1963, 1964 and 1965 Industrial Life Insurance Company paid premiums to itself on policies of life insurance on the lives of certain officers of the corporation, all of whom are members of the Scyphers family (Mr. Clayton Scyphers, his wife and his son), and the plaintiff was the beneficiary under said policies. The amounts paid in premiums for the respective years on these key man insurance policies were $3,561.25, $3,236.95 and $6,992.00. On these policies the plaintiff was not only the insurer and the beneficiary, but also paid the premiums.

11. During 1963 and 1964 the plaintiff had annual income from weekly premium, Industrial Life policies on members of the Scyphers family of $83.20 and $41.60. No such income was received during the year 1965.

12. The total premium income for the three taxable years was 1963—$6,216.91, 1964—$6,796.11 and 1965—$10,415.92.

13. During the tax years in question, the plaintiff did not maintain a sales force, its office was located in the home of its president, Mr. Clayton Scyphers, and its primary income has been from the sale of real estate lots, rental of real estate and management of its investment portfolio. The activities of the corporation may best be shown from the following comparison of premium and investment income.

Comparison of Premium and Investment Income

|  | 1963 | 1964 | 1965 |
|---|---|---|---|
| Premium Income | $ 6,216.91 | $ 6,796.11 | $10,415.92 |
| Other Income | | | |
| Interest: | | | |
| On Mortgages | 7,431.30 | 8,346.85 | 8,955.24 |
| Miscellaneous | 56.09 | –0– | –0– |
| Consumer Investment | 1,234.37 | 2,400.00 | 2,483.08 |
| Bldg. & Loan | 833.75 | 1,685.05 | 2,897.82 |
| Rents | 4,965.12 | 5,982.45 | 6,055.12 |
| Sale of lots | 20,000.00 | 22,000.00 | –0– |
| Capital gain—installment sale | 204.77 | 221.25 | –0– |
| Total Investment Income | $34,725.40 | $40,635.60 | $20,391.26 |

Comparison of Source of Premium Income

|  | 1963 | 1964 | 1965 |
|---|---|---|---|
| Family premiums | $3,644.45 | $3,278.55 | $6,992.00 |
| Other premiums | 2,572.46 | 3,517.56 | 3,423.92 |

14. In 1948 plaintiff bought 504 acres of land in Kershaw County, South Carolina as an investment. Part of this tract has been subdivided into residential lots and the above figures reflect $20,000 in 1963 and $22,000 in 1964 from the sale of such lots. In 1963 the plaintiff by three separate deeds conveyed to Clayton Scyphers eleven lots from this tract. In 1964 by one deed the plaintiff conveyed to Clayton Scyphers eleven lots out of this tract.

15. Prior to 1963 the real estate sales by plaintiff totaled thirteen in 1956, two in 1957, three in 1958, nine in 1959, four in 1960, eight in 1961 and three in 1962. Some of these sales covered more than one lot. Prior to 1963 there were no sales to Clayton Scyphers or members of his family. Prior to beginning the sale of residential lots out of the 504 acre tract, plaintiff obtained permission from the South Carolina Insurance Commission. On the lots sold to Clayton Scyphers, homes were constructed by him and sold.

16. The real estate, originally purchased as an investment, became property held for sale in the ordinary course of business due to the continued sale and development, and the large part of plaintiff's income resulting from such sales.

17. Since the time the Scyphers family obtained control of the plaintiff corporation, it has not paid a dividend. Earnings and profits have been accumulated, and the unassigned surplus account at the end of each of the years in suit was $232,765.41 for 1963, $260,018.06 for 1964 and $269,099.38 for 1965.

18. Plaintiff has shown no reasonable needs of the business to justify the continued accumulation of earnings and profits. It has been contended that these accumulations are necessary under requirements of South Carolina State Law (§ 37–181, 183 Code of Laws of South Carolina 1962) which provide minimum initial capital and surplus of $600,000.00. This figure is now required only of new insurance companies and does not apply to the plaintiff, which was chartered in 1939.

19. If the plaintiff is concerned about a possible change in the South Carolina law which would require its capital and surplus to be increased to $600,000, it is obvious that at the present rate of earnings accumulation, the plaintiff will not reach this figure for many, many years. If plaintiff really desired to build up its capital and surplus, it should increase its premium income by sale of insurance policies and its capital base by the sale of additional stock.

20. Plaintiff maintained and owned an automobile which was used by its president Mr. Clayton Scyphers for both business and personal uses. Due to the limited nature of plaintiff's business activities, it is found that not more than 25% of the automobile expenses were incurred in the conduct of plaintiff's business.

## CONCLUSIONS OF LAW

1. Plaintiff was not a life insurance company within the meaning of the Internal Revenue Code of 1954 during the years 1963, 1964 and 1965.

The plaintiff mistakes the right to tax a life insurance company with the right to regulate such company. It contends that the McCarren Act 15 U.S.C.A. § 1011 clearly demonstrates the intent of Congress to leave regulation of insurance companies to the respective states. Since the plaintiff is chartered by the State of South Carolina as a life insurance company, files reports with and is regulated by the South Carolina Insurance Commission, plaintiff argues that the Federal Government may not contend otherwise. In the McCarren Act it is stated:

"Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to

the regulation or taxation of such business by the several States."

Congress did not give up the right to tax insurance companies by passing the McCarren Act. Prior to 1921, insurance companies were taxed as ordinary corporations, but by the Revenue Act of 1921 Congress established a different method for taxing insurance companies, which methods, with some modification, have prevailed to this date. By establishing special taxing systems for insurance companies, because their premium and investment income differs from the income of manufacturing companies and other corporations, Congress had the right and power to decide what companies would be considered as insurance companies for tax purposes and enjoy the benefits of this legislation. Congress also had the power to decide which companies within the insurance industry would be treated by the Internal Revenue Service as life insurance companies, since their requirements differed from casualty insurance companies. 26 U.S.C.A. § 801 et seq., provides for the taxation of life insurance companies by the United States of America.

In Section 801(a) life insurance companies are defined:

"For purposes of this subtitle, the term 'life insurance company' means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), or noncancellable life, health, or accident policies not included in the life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c))."

Before a company may be classified under the above section as a life insurance company, it is necessary to determine if it is an insurance company, since this is the first requirement mentioned. The Internal Revenue Code does not define the term "insurance company", but Treasury Regulations on Income Tax (1954 Code), Section 1.801.-3(a) provides:

"(1) The term 'insurance company' means a company whose primary and predominant business activity during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. Thus, though its name, charter powers, and subjection to State insurance laws are significant in determining the business which a company is authorized and intends to carry on, it is the character of the business actually done in the taxable year which determines whether a company is taxable as an insurance company under the Internal Revenue Code."

"Section 1.801–3(2)(b) Life Insurance Company. (1) The terms 'life insurance company' as used in subtitle A of the Code, is defined in Section 801(a). For the purpose of determining whether a company is a 'life insurance company' within the meaning of that term as used in Section 801(a), it must first be determined whether the company is taxable as an insurance company (as defined in paragraph (a) of this section) . . . ."

Treasury Regulations have the force and effect of law and provide a standard to be followed in determining plaintiff's classification under the Internal Revenue Code. It is apparent that the nature and character of the business actually done in a particular tax year is controlling on whether a company is to be treated as an insurance company under the law. The test is applied on a year to year basis, so it is possible for a company to qualify as a life insurance company in one year, but not in the preceding or succeeding years.

The basic question presented is whether the issuance of insurance contracts by

the plaintiff constituted its primary and predominant business activity in 1963, 1964 and 1965. It is obvious from the financial information contained in Finding of Fact No. 13 that premium income for these years was small when compared with income from real estate, mortgages and investment.

It is also important to note that more than half of the premium income came from policies on the lives of the only officers and stockholders of the company. The only insurance contract written on persons outside the family was the group credit policy, which was issued prior to the years in suit. Although there was a sizable increase in premium income in the year 1965, all of this increase is attributable to members of the Scyphers family, which means that the plaintiff was buying additional insurance from itself insuring the lives of its officers and stockholders. Since this "key man" insurance was kept by the plaintiff and not reinsured with another company, the death of one of the members of the family, insured under a policy with plaintiff, would mean only a bookkeeping entry to the plaintiff, since the money would simply be transferred from one account to another, because the plaintiff is also the beneficiary.

One of the examples cited under Regulation 1.801–1(b)(2) is quite helpful in the present facts. It provides as follows:

"For example, during the year 1954 the M Corporation, incorporated under the insurance laws of the State of R, carried on the business of lending money in addition to guaranteeing the payment of principal and interest of mortgage loans. Of its total income for the year, one-third was derived from its insurance business of guaranteeing the payment of principal and interest of mortgage loans and two-thirds was derived from its noninsurance business of lending money. The

M Corporation is not an insurance corporation for the year 1954 within the meaning of the Code and the regulations thereunder."

The plaintiff relies heavily upon the case of Alinco Life Insurance Company v. United States, 373 F.2d 336, 178 Ct.Cl. 813 (1967). A close examination of *Alinco* reveals that it is primarily a decision involving qualification as a life insurance company. The only business of *Alinco* was reinsuring certain risks under a reinsurance treaty with another insurance company. Even though *Alinco* did business with only one carrier, the risk during the tax year involved amounted to almost one billion dollars. Its sole business activity was in the reinsurance field and it did not have the majority of its income coming from real estate mortgages, dividends and interest. Alinco was also serving a legitimate business purpose of its owner, a large finance company, since the owner could not engage in the insurance business under the laws of the state under which it was incorporated.

The case of Cardinal Life Insurance Company v. United States of America (N.D.Tex.1969) 300 F.Supp. 387 [1] is quite similar to the present facts, since Cardinal was duly licensed and chartered to do business in the State of Texas as a life insurance company, but did not maintain an active sales force soliciting and selling policies and its premium income represented a very small part of its total income. The remainder of its income came from interest, capital gains, rent and dividends. In *Cardinal*, the Court stated:

"It should be noted that the name of the company, the charter powers and subjection to State insurance laws are significant only in ascertaining the business which the company is authorized to conduct. Whether the Plaintiff is to be classed as a life insurance company for federal taxation purposes

---

1. On appeal from the United States this case was reversed in 425 F.2d 1328 (5th Cir. 1970). The reversal was on the ground of the district judge's misinterpretation of the Statute of Limitations and allowed government to go back three additional years and not on any ground having to do with the insurance question.

is determined by the character of the business actually done during the taxable year. Bowers v. Lawyers Mortgage Co. 285 U.S. 182 [52 S.Ct. 350, 76 L.Ed. 690] (1932). Thus, to qualify as a life insurance company under the federal tax laws; a corporation must use its capital and efforts *primarily* in earning income from the issuance of contracts of insurance. See Louisville Title Company v. Lucas 27 F.2d 413 (W.D.Ky.). Moreover, the test is to be applied to the taxpayer on a year by year basis.

The question presented to the Court in this case then is whether the issuance of insurance contracts by Plaintiff constitutes its *primary* and *predominant* business activity during each of the taxable years involved. A review of the schedule of business activities set forth above clearly indicates that plaintiff was not 'primarily and predominately' in the business of issuing life insurance contracts during any of the years involved in this action . . ."

In the *Lawyers Mortgage Co.* case, supra, the premium income of the taxpayer constituted about 35 percent of its total income, yet the Supreme Court held that it was not primarily in the insurance business within the meaning of the term "insurance company", as used by Congress. The premium income of Industrial Life is less than 20 percent of its total income, and when premiums on policies of the Scyphers family are omitted, premium income amounts to approximately 8 percent of the total for the years in question.

■ The Court concludes that for the years 1963, 1964 and 1965 the plaintiff was not a life insurance company under Section 801 et seq. of the Internal Revenue Code of 1954, since its primary and predominate business activity during these years was not issuing insurance or annuity contracts or reinsuring the risks underwritten by other insurance companies.

■ 2. The plaintiff allowed its earnings to accumulate beyond the reasonable needs of the business and is therefore subject to the accumulated earnings tax imposed by Section 531 of the Internal Revenue Code of 1954. Sections 531, 532 and 533 provide, in part, as follows:

"Section 531. Imposition of accumulated earnings tax

In addition to the other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of —

(1) 27½ percent of the accumulated taxable income not in excess of $100,000, plus

(2) 38½ percent of the accumulated taxable income in excess of $100,000."

Section 532. Corporation subject to accumulated earnings tax

(a) General Rule. The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed . . ."

Section 533. Evidence of purpose to avoid income tax

(a) Unreasonable accumulation determinative of purpose.—For the purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary . . ."

■ The taxpayer argues that since its stockholders are in a lower income tax bracket than the corporation, it is unlikely that the taxpayer has accumulated its earnings to avoid "the income tax with respect to its shareholders". This argument has no merit. The purpose of the accumulated earnings tax can be no better expressed than by the language of Section 532 above. It is recognized that a corporation's normal objective is not only to earn profits, but to pass these profits on to its shareholders in the form of dividends. Regardless of the shareholders tax bracket, as compared to the corporation, dividends are taxed twice—once as the earnings of the corporation and again as a part of the taxable income of the shareholder.

This statutory restriction on the use of corporations to avoid income taxes of its shareholders is necessary when one considers the steeply graduated tax rates for individuals and compares them to the maximum tax rate for corporations. A corporation may be used to shield income when it is earned, and by accumulation of its earnings to avoid, either entirely or partially, the tax that would normally fall upon distribution to its shareholders.

Usually it is impossible to find the unanimity of interest among stockholders necessary to limit or abolish the payment of dividends except in family or closely held corporations. If dividends are not paid and the individual income tax thereon is not received, the tax law, through 531, collects these funds directly from the corporation when there has been an accumulation. As stated in Helvering v. National Grocery Co., 304 U.S. 282, 286, 58 S.Ct. 932, 934, 82 L.Ed. 1346 (1938):

"The statute in no way limits the powers of the corporation. It merely lays the tax upon corporations which use their powers to prevent imposition upon their stockholders of the federal surtaxes."

■ It is not necessary that "the purpose of avoiding the income tax with respect to its shareholders" be the sole, the primary or the dominant purpose for the accumulation. It is sufficient that such purpose be one of the motives which prompt the accumulation beyond the reasonable needs of the business. United States v. Donruss Co., 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969).

Section 533(a) places the burden upon the corporation to prove by the preponderance of the evidence that such accumulations are not beyond the reasonable needs of the business. The plaintiff has failed to carry this burden. As pointed out in Finding of Fact No. 19, if plaintiff really wished to increase its capital and surplus there are other and more effective methods to accomplish this.

■ To justify such an accumulation, the need must be treated with economic reality. It is not sufficient for a taxpayer to merely recognize the problem and discuss it. "Definiteness of plan coupled with action taken toward its consummation are essentials." Dixie, Inc. v. Commissioner of Internal Revenue, 277 F.2d 526, 528 (2nd Cir. 1960).

■ 3. The plaintiff was engaged in the sale of lots in the ordinary course of its trade or business during the years 1963 and 1964 and the gain resulting therefrom was subject to taxation at ordinary income tax rates.

Although the taxpayer originally purchased the land in Kershaw County as an investment, the corporation's purpose changed when it began to develop, subdivide and sell lots. This is particularly true in this case where the other activities of the corporation were so limited in scope and income. However, this property later became an asset held for sale in the ordinary course of business.

■ Since the capital gain statutes provide an exception to and reduction of the normal tax rates, they are to be narrowly construed. Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). The frequency and continuity of sales by the plaintiff

is demonstrated by the findings of fact in 14 and 15 above. It is obvious that these transactions were not "isolated" but show a pattern in the development and sale of lots. Although the property may have been bought as an investment, the real question is decided by the purpose for which it is being held at the time of the sale. Acquisition of property as an investment is not inconsistent with the later holding of the same property for sale to customers in the ordinary course of business. See Ackerman v. United States, 335 F.2d 521 (5th Cir. 1964) and Bauschard v. C. I. R., 279 F. 2d 115 (6th Cir. 1960).

4. The automobile owned by the taxpayer and used by its president was not used more than 25 percent in the conduct of its business, and the expenses disallowed by Internal Revenue Service for such expenses are proper.

The testimony shows that the plaintiff provides its president with an automobile, which was used both for conducting the plaintiff's business as well as the president's personal and family pleasure. The office of the plaintiff was located in the home of its president and due to the very limited activities of the plaintiff, only a small amount of automotive travel was required. The plaintiff owned real estate in Kershaw County, a distance of only 20 to 25 miles from plaintiff's office, and trips to this property were not required on any regular or frequent basis.

Under Section 162(a) of the Internal Revenue Code, a deduction is allowed for all "ordinary and necessary expenses" paid or incurred in carrying on a trade or business. The operation of an automobile used in the business falls within this classification, but this does not include the use of said automobile for the personal affairs of an officer or employee of the corporation. The only reasonable inference to be drawn from the evidence in this case is that the Internal Revenue Service was generous in allowing the plaintiff to deduct 25 percent of the expenses in connection with the operation of said automobile.

It is, therefore, ordered that this case be and the same is hereby dismissed with costs.