**SECURITY INDUSTRIAL INSURANCE COMPANY, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

Nos. 81-3804, 81-3805.

United States Court of Appeals, Fifth Circuit.

April 22, 1983.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Michael L. Paup, Chief, Jonathan S. Cohen, Kristina E. Harrigan, Attys., Appellate Section, Dept. of Justice, Washington, D.C., for defendant-appellant.

Molony, Nolan, North, Riess & Hall, F. Kelleher Riess, Metairie, La., for plaintiff-appellee.

Before BROWN, GOLDBERG and HIGGINBOTHAM, Circuit Judges.

GOLDBERG, Circuit Judge:

This appeal of a tax refund suit concerns the taxability of certain policyholders surplus accounts,[1] which assertedly were carried over tax-free from Southern National Life Insurance Co. ("Southern") and Standard Life Insurance Co. ("Standard") to appellee Security Industrial Insurance Co. ("Security"). The district court found that reorganizations described in section 368(a)(1)(F) ("F reorganizations") had occurred and permitted the carryover of the policyholders surplus accounts. Because we believe that the district court erred in failing to apply the step transaction doctrine to the events that transpired, we reverse.

## I. FACTS AND PROCEEDINGS BELOW

### A. Facts

Security, the taxpayer-appellee, is a stock Louisiana life insurance company specializing in small policies written on a home service basis. E.J. Ourso founded Security in 1948 and has served as its chief executive

---

1. Section 815(c) of the Internal Revenue Code of 1954 permits a stock life insurance company to establish and maintain a policyholders surplus account. This account consists of a portion of the life insurance company's underwriting income, which may be set aside tax free and remains untaxed until the funds are distributed to shareholders or the company terminates its operations. *See infra* at 1240–1241. A life insurance company may maintain a policyholders surplus account as a "cushion" *in addition to* the mandatory reserves required by state law; thus, the term "policyholders surplus account" is not synonymous with "reserves." Hereinafter, all section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. The Internal Revenue Code is not an holistic document. While recent amendments and changes may not give this opinion gospel attributes, the opinion does represent the state of the law for the years in question.

officer and controlling shareholder at all relevant times. Over the years Security has experienced phenomenal growth, primarily through the acquisition of its rivals. Security's customary acquisition strategy has been to identify a likely merger partner, purchase that company's stock in a fully taxable transaction, and then merge the acquired company into Security.

### 1. The Southern Acquisition

In 1970 Security set its sights on Southern as a potential acquisition target; negotiations between the two companies began in September or October of that year. At about the same time, Security approached several lenders with regard to financing the purchase. Because Security showed a deficit in its insurance accounting, however, the banks were reluctant to loan Security the funds necessary to consummate the merger.

Ultimately Security arranged to borrow over $2 million from Louisiana National Bank ("Bank"). As a condition of the loan, the Bank required Ourso and the other Security shareholders to form a holding company, Ourso Investment Co. ("OIC"). The Bank also demanded the stock of Security and OIC and Ourso's personal signature as collateral for the loan. The Security shareholders formed OIC on December 8, 1970, exchanging each of their Security shares for one share in OIC. Security thus became a wholly owned subsidiary of OIC. OIC's assets included the Security shares, funeral homes, and real estate.

With this condition of the loan agreement satisfied, Ourso proceeded with the purchase of the Southern shares. On December 9, 1970, Ourso and the majority shareholders of Southern executed a purchase agreement for the Southern shares. OIC's directors met on January 2, 1971, and resolved to acquire the Southern shares, to borrow the necessary funds from Security and the Bank, and to liquidate Southern and reinsure its outstanding policies following the acquisition. The purchase of the Southern shares was consummated by January 4, 1971, whereupon OIC became Southern's sole shareholder. The following day,

January 5, 1971, OIC (as sole shareholder of Southern) resolved to liquidate Southern and appointed Ourso as liquidator.

At this time OIC, Southern, and Security executed two collateral agreements that had been informally cleared with the Louisiana Commissioner of Insurance about one month earlier. Ourso, acting in his capacity as liquidator of Southern, entered into a reinsurance agreement with Security effective as of January 5, 1971, at midnight. Pursuant to this reinsurance agreement, Security assumed all of Southern's outstanding policies and the associated risks and liabilities; in return, Southern transferred to Security assets sufficient to reserve fully the assumed risks. A reinsurance agreement of this sort is the insurance industry's functional equivalent of a sale of assets.

In addition to its reinsurance agreement with Southern, Security executed a contingent payment agreement with OIC. This agreement obligated Security to pay $1,367,000 to OIC in consideration for OIC's consent to Security's reinsurance agreement with Southern. The OIC-Security agreement provided for monthly payments of $17,500 each, payable out of premiums collected on the reinsured Southern policies.

In early January 1971, Southern's assets and liabilities were transferred from Southern's books to OIC's books. Immediately thereafter, OIC converted Southern's surplus and net worth into cash and used the proceeds to pay off a portion of OIC's purchase money loan at the Bank. OIC then transferred the remaining assets and liabilities of Southern to Security. In February and March 1971, all of Southern's collections were posted to Security's books.

Southern filed its life insurance company income tax return for the taxable year 1970 on June 12, 1971. This return was captioned "Final Return" and was the last income tax return filed by Southern. On December 7, 1971, the Louisiana Commissioner of Insurance issued a certificate declaring Southern formally and finally dissolved under state law.

## 2. The Standard Acquisition

OIC, as Security's holding company, initiated efforts to acquire Standard during summer and autumn of 1971. The Standard acquisition was effected in generally the same manner as the Southern transaction. OIC offered to purchase the outstanding Standard shares on October 12, 1971. The following week, on October 19, 1971, OIC's directors resolved to acquire the Standard shares, to borrow the funds necessary to finance the purchase, and to liquidate Standard and reinsure its outstanding policies following the acquisition. By October 25, 1971, OIC had acquired the Standard shares and became Standard's sole shareholder. OIC immediately resolved to liquidate Standard, to appoint Ourso as liquidator, and to reinsure Standard's policies with Security.

Security and OIC entered into a contingent payment agreement on October 26, 1971, under which Security was bound to pay OIC $2.5 million in consideration for OIC's consent to a reinsurance agreement between Security and Standard. This agreement provided for monthly payments of $36,500, to be paid out of premiums received on Standard's reinsured policies. Security and Standard then executed a reinsurance agreement on November 3, 1971. The reinsurance agreement required Security to assume Standard's policy liabilities as of October 25, 1971, provided that Standard transferred to Security assets sufficient to reserve the reinsured policies fully.

On December 31, 1971, Standard's assets and liabilities were transferred onto OIC's books. OIC immediately liquidated Standard's net worth and surplus to discharge part of the debt incurred in connection with the Standard acquisition. The remaining assets and liabilities of Standard were transferred from OIC to Security the same day. Premiums from Standard's reinsured business began to appear on Security's books in February 1972.

On April 24, 1972, Standard filed its life insurance company income tax return for the 1971 taxable year. This return, captioned "Final Return," was the last federal income tax return filed by Standard. The Louisiana Commissioner of Insurance issued its official certificate of dissolution for Standard on May 8, 1972.

### B. Procedural History

In the course of an audit of Security's 1970 and 1971 life insurance company income tax returns, an Internal Revenue Service ("IRS") agent mailed two unexecuted transferee liability forms to Ourso, as president of Security. These forms provided that Security would pay any and all taxes ultimately assessed against Southern and Standard. Ourso signed both forms and returned them to the IRS.[2]

On June 23, 1975, the IRS notified Security of the assessment of deficiencies in tax as a result of the dissolutions of Southern and Standard.[3] Security paid the additional taxes, plus interest, and filed for a refund. When the refund claim was denied, Security filed this suit in the United States District Court for the Eastern District of Louisiana.

The district court noted that under limited circumstances Security would be entitled to carry over certain favorable tax attributes belonging to Southern and Standard. In particular, the district court observed that if the acquisitions of Southern and Standard were construed as corporate reorganizations described in section 368(a)(1)(F), Security could retain the policyholders surplus accounts of Southern and Standard without suffering adverse tax conse-

---

**2.** Both documents are undated, a fact that underlies one of the issues in this case.

**3.** In its assessment of deficiencies, the IRS contended that Southern was not an insurance company for 1971 and that, pursuant to I.R.C. § 815(a)(2), Southern's life insurance company taxable income for 1970 should include the amount in its policyholders surplus account. The IRS further asserted that Security was liable for the taxes resulting from the inclusion in income of the policyholders surplus account by virtue of the transferee agreement signed by Ourso. The IRS made a similar determination as to Standard for the taxable year 1971.

quences. After reviewing the statutory and judicial history of section 368(a)(1)(F), the district court determined that the acquisitions of Southern and Standard satisfied the requirements of F reorganizations. Accordingly, the court concluded that Security was not required to include in its income the policyholders surplus accounts of Southern and Standard and held that Security was entitled to a refund. The government now appeals from the holding in favor of Security.

## II. ISSUES ON APPEAL

The Internal Revenue Code ("Code") affords special tax treatment for life insurance companies. See I.R.C. §§ 801–820. In particular, the Code provides that funds held in the policyholders surplus account of a life insurance company may be excluded from the computation of life insurance company taxable income so long as they are not distributed to shareholders. See id. §§ 815(c), 802(b)(3). If a life insurance company terminates its operations, the amount remaining in its policyholders surplus account must then be included as income for the company's final taxable year. Id. § 815(d)(2).

Under certain circumstances, however, the policyholders surplus account need not be included in income even if the life insurance company ceases its operations. In a limited class of corporate acquisitions, an acquiring corporation may retain the tax advantages of an acquired corporation, including the tax-free maintenance of a policyholders surplus account. Thus, if a life insurance company acquires the assets of another life insurance company in a complete liquidation under section 332 to which section 334(b)(2) does not apply or in a reorganization described in section 368(a)(1)(A), (C), (D), (F), or (G), the acquiring life insurance company succeeds to the policyholders surplus account of the acquired life insurance company, and no part of the policyholders surplus account is included in income. See id. § 381(a), (c)(22).

In this case, the district court determined that the acquisitions of Southern and Stan-

dard by Security fit the pattern of F reorganizations. Accordingly, the court concluded that Security was entitled to retain the policyholders surplus accounts of Southern and Standard without incurring any additional tax liability. From this adverse judgment, the IRS appeals.

The government first argues that the district court erred in construing the Southern and Standard acquisitions as F reorganizations. Instead, the government invokes the tried and true step transaction doctrine, asserting that the original purchases of Southern and Standard, the transfers of their assets through OIC to Security, and their ultimate dissolutions were merely intermediate steps in Security's preconceived plans to acquire the assets of Southern and Standard for cash. The government claims that when the transactions are viewed in this fashion, the Southern and Security acquisitions fail to satisfy the continuity of interest requirement of F reorganizations.

In addition, the government presents an argument based upon alternative statutory grounds. Even if the acquisitions of Southern and Standard are not construed as F reorganizations, Security still may carry over the policyholders surplus accounts if Southern and Standard were liquidated in transactions to which the basis rule of section 334(b)(2) does not apply. The government maintains that Southern and Standard were completely liquidated pursuant to section 332 under circumstances in which section 334(b)(2) would apply. Consequently, the government claims, no carryover of tax attributes such as the policyholders surplus accounts should be permitted in this case.

The final issues presented in this appeal concern the validity of the tax assessments levied against Security. Security claims that the assessments are faulty in two respects. First, Security contends that the deficiencies were assessed for the wrong taxable years. Second, Security urges that it is not liable for any tax allegedly owed by Southern or Standard because it is not a transferee within the meaning of section 6901. Concomitantly, Security argues that

the transferee liability forms were executed after the statute of limitations had expired and therefore are invalid. For these reasons, Security claims entitlement to a refund even if Southern and Standard are required to include their policyholders surplus accounts in income.[4]

We shall address each of these arguments in turn.

## III. DEEP BACKGROUND: THE CODAL UNDERPINNINGS

Code sections 801–820 govern the income tax treatment of life insurance companies.[5] In enacting these special provisions, Congress recognized that life insurance companies have two potential sources of income: investment income and underwriting income. *See* S.Rep. No. 291, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Ad.News 1575, 1576, 1581. When a life insurance company derives a profit from its investment of premiums and reserves, it reaps investment income. By contrast, underwriting income results when the premiums collected by a life insurance company exceed benefits paid and expenses incurred.[6]

Section 802(a) imposes a tax on the "life insurance company taxable income" of every life insurance company; section 802(b)

defines "life insurance company taxable income" in terms of investment income and underwriting income. To paraphrase the cryptic and convoluted Codal parlance, "life insurance company taxable income" generally includes the sum of a life insurance company's taxable investment income and fifty percent of its underwriting income. I.R.C. § 802(b)(1), (2). The other fifty percent of the company's underwriting income is placed in a policyholders surplus account, *see id.* § 815(c), and is included in life insurance company taxable income only if it is distributed to the company's shareholders. *Id.* § 802(b)(3).[7]

Thus the Code permits a life insurance company to accumulate fifty percent of its annual underwriting income in a policyholders surplus account, which is not taxed on a current basis. By allowing this special exclusion from life insurance company taxable income, Congress provided life insurance companies with a "cushion" to cover any special contingencies that might arise. S.Rep. No. 291, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Ad.News 1575, 1601. Congress concluded, however, that a distribution to shareholders from the policyholders surplus account represents a determination by the life insurance company that the "cushion" is not needed. *Id.*

4. The government and Security have pressed their arguments regarding liquidation, the correct taxable year, and Security's transferee liability since this action began. Because the district court found the F reorganization issue dispositive, it did not address these three alternative contentions.

5. "Life insurance company" is defined in I.R.C. § 501. Security, Southern, and Standard are all life insurance companies according to this definition.

6. Underwriting income generally has two sources. First, the life insurance company may experience "mortality gains" when policyholders live past their life expectancies. In this situation, income arises because the premiums paid exceed the amount required to meet charges for claims. Second, the life insurance company may profit from "loading" gains. "Loading" occurs when the amounts included in the premiums to cover expenses exceed the actual operating expenses incurred in servicing a policy. Both "mortality gains" and "loading income" are forms of profit to the insurance

company different in kind from its investment income. *See* S.Rep. No. 291, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Ad. News 1575, 1581; 8 J. Mertens, *The Law of Federal Income Taxation* § 44.17 (Doheny ed. 1978).

7. By creating this three-phase scheme of taxation in the Life Insurance Company Income Tax Act of 1959, Pub.L. No. 86–69, 73 Stat. 112, Congress for the first time attempted to tax the underwriting income of life insurance companies. While believing that underwriting income should be subject to tax, Congress recognized the difficulty in making accurate determinations of such income on an annual basis. S.Rep. No. 291, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Ad.News 1575, 1581. Accordingly, the Code provides for bifurcated treatment of underwriting income. Half the underwriting income is taxed as it accrues each year; the other half is taxed when it is distributed to shareholders. *Id.* at 1581–82.

Consequently, the Code requires that amounts distributed out of the policyholders surplus account must be included in life insurance company taxable income for the year of distribution. I.R.C. § 802(b)(3).

The tax deferral possibilities inherent in the concept of policyholders surplus accounts prompted Congress to enact some additional statutory provisions designed to forestall abuse. Section 815(d)(4) limits the amounts that may be maintained in the policyholders surplus account. In addition, section 815(d)(2) generally provides that when a life insurance company terminates its operations, it must include in income for its last taxable year the amounts contained in its policyholders surplus account. Thus the tax shelter potential of these surplus accounts is not untrammeled.

In the context of this case, we focus our attention on the deferral termination mechanism of section 815(d)(2)(A).[8] This section provides that, except as provided in section 381(c)(22) relating to carryovers in certain corporate readjustments, a life insurance company that is not an insurance company for any taxable year must include in its life insurance company taxable income for the last preceding taxable year the amount remaining in its policyholders surplus account. For example, a life insurance company that was not an insurance company for the taxable year 1982 must include in its 1981 life insurance company taxable income the remaining balance in its policyholders surplus account, assuming section 381(c)(22) does not apply.

If section 381(c)(22) *does* apply, however, it supersedes the section 815(d)(2) requirement that policyholders surplus accounts be included in taxable income. Section 381 governs the carryover of tax attributes in

connection with certain corporate acquisitions. Section 381(a) provides as follows:

(a) General rule.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b)(2); or

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D), (F), or (G) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

Section 381(c)(22) permits an acquiring corporation that is a life insurance company to succeed to various tax attributes of an acquired life insurance company, including the acquired corporation's policyholders surplus account. *See* Treas.Reg. § 1.381(c)(22)–1(a), (b)(7)(i). When sections 381(a) and 381(c)(22) are read together with section 815(b)(2)(A), they provide that when a life insurance company ceases to be an insurance company by virtue of either a section 332 liquidation to which section 334(b)(2) does not apply or a corporate reorganization described in section 368(a)(1)(A), (C), (D), (F), or (G), its policyholders surplus account may be carried over to its successor

---

**8.** I.R.C. § 815(d)(2)(A) provides as follows:

(2) Termination as life insurance company.—
(A) Effect of termination.—Except as provided in section 381(c)(22) (relating to carryovers in certain corporate readjustments), if—
(i) for any taxable year the taxpayer is not an insurance company, or
(ii) for any two successive taxable years the taxpayer is not a life insurance company,

then the amount taken into account under section 802(b)(3) for the last preceding taxable year for which it was a life insurance company shall be increased (after the application of subparagraph (B)) by the amount remaining in its policyholders surplus account at the close of such last preceding taxable year.

without adverse tax consequences to either corporation.

In the instant case, Southern and Standard at some point terminated their activities as insurance companies. Under the general rule of section 815(b)(2)(A), each company is required to include the balance remaining in its policyholders surplus account in its taxable income for the taxable year preceding its termination. This general rule does not apply, however, if the terminations of Southern and Standard fulfill the requirements of section 381(a). Thus, if the Southern and Standard acquisitions were section 332 complete liquidations to which section 334(b)(2) would not apply or corporate reorganizations described in section 368(a)(1)(A), (C), (D), (F), or (G), Security (as successor to Southern and Standard) may carry over the policyholders surplus accounts, and no tax may be imposed on Southern, Standard, or Security.

Security's entitlement to a refund in this case thus hinges upon the application of section 381(a). The district court held that the Southern and Standard transactions were F reorganizations and allowed the tax-free carryover of their policyholders surplus accounts to Security. On this appeal, the government contends that the district court erred in determining that F reorganizations had occurred. Additionally, the government urges that Security fails to satisfy the alternative requirement of section 381(a) because the Southern and Standard acquisitions were complete liquidations to which section 334(b)(2) *does* apply. We now turn to an appraisal of these positions.

## IV. THE F REORGANIZATION THEORY

### A. Requirements of F Reorganizations

The Code defines an F reorganization as "a mere change in identity, form, or place of organization, however effected." I.R.C.

§ 368(a)(1)(F). This provision of the Code is not further amplified by the regulations and until recently received little judicial or administrative attention. *See* B. Bittker & J. Eustice, *Federal Income Taxation of Corporations & Shareholders* ¶ 14.18 (1979). Apparently F reorganization treatment originally was intended to apply only to a narrow category of formalistic changes in the structure of a single corporation. *See* Metzer, *An Effective Use of Plain English—The Evolution and Impact of Section 368(a)(1)(F)*, 32 Tax Law. 703, 704–08 (1979). This form of corporate restructuring has been expanded greatly through the case law, however; today the scope of F reorganizations includes mergers of a subsidiary into its parent, *see Movielab, Inc. v. United States*, 494 F.2d 693 (Ct.Cl.1974), fusions of multiple affiliated operating companies, *see Estate of Stauffer v. Commissioner*, 403 F.2d 611 (9th Cir.1968), and consolidations of multiple subsidiaries into a single subsidiary, *see Home Construction Corp. v. United States*, 439 F.2d 1165 (5th Cir.1971).[9]

■ In *Davant v. Commissioner*, 366 F.2d 874 (5th Cir.1966), *cert. denied*, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967), and *Home Construction Corp. of America v. United States*, 439 F.2d 1165 (5th Cir.1971), the Fifth Circuit established several criteria for F reorganization treatment. A combination of two or more corporations qualifies as a "mere change in identity, form, or place of organization" if there is an "identity of shareholders and their proprietary interests, unimpaired continuity of the essential business enterprise and a new form which is the alter ego of the old." *Home Construction*, 439 F.2d at 1170. Furthermore, "there must be a legitimate business purpose independent of and in addition to the tax consequences of the merger." *Id.*

9. In the Tax Equity & Fiscal Responsibility Act of 1982, § 225, Pub.L. No. 97–248, 1982 U.S. Code Cong. & Ad.News (96 Stat.) 10, 169, Congress restricted the range of transactions that may be classified as F reorganizations. As amended, section 368(a)(1)(F) limits F reorganization treatment to a "mere change in identity, form, or place of organization *of one corporation,* however effected" (emphasis added). Because the amendment applies only to plans of reorganization adopted on or before August 31, 1982, it does not control the disposition of this case.

at 1172.[10] Thus a corporation may be born again by the grace of section 368(a)(1)(F), provided there are no distortions in the corporation's ownership, business, or purposes.

The controversy in this case focuses upon the requirement of an identity of shareholders and their proprietary interests. This "continuity of interest" doctrine developed as a judicial embellishment of the Codal reorganization provisions [11] and is now codified in the applicable regulations, which provide that "[t]he term ["reorganization"] does not embrace the mere purchase by one corporation of the properties of another corporation, for it imports a continuity of interest on the part of the transferor or its shareholders in the properties transferred." Treas.Reg. § 1.368–2(a). Thus, in order for a corporate combination to warrant tax-free reorganization treatment, the former owners of the acquired corporation must maintain a continuing proprietary interest in the acquiring corporation. This circuit has emphasized the importance of continuity of shareholder interest in the context of F reorganizations, noting that "a substantial shift in the proprietary interest in a corporation accompanying a reorganization can hardly be characterized as a mere change in identity or form." *Davant,* 366 F.2d at 883 (citing *Helvering v. Southwest Consolidated Corp.,* 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942)).

The continuity of interest issue here is basically one of timing: at what stage in these transactions should the shareholders' proprietary interests be measured? The district court, adopting Security's position, viewed OIC's initial purchases of the Southern and Standard stock as transactions separate and distinct from the later liquidations of the two corporations and their mergers into Security. The district court accordingly limited its evaluation of continuity of shareholder interest to the proprietary interests in Southern, Standard, and Security as they stood *following* the time of OIC's original stock purchases. At that point, Southern, Standard, and Security exhibited complete identity of shareholder interests; OIC, the Ourso family holding company, owned all the stock in all three insurance companies. Viewing the transactions through this narrow time window, the district court held that the continuity of interest requirement for F reorganizations was satisfied.

The government advocates the use of a wider time window for measuring the continuity of proprietary interests in this case. The government asserts that the stock purchases, asset transfers, reinsurance agreements, and liquidations were all merely intermediate steps in Security's plans to acquire the assets of Southern and Standard for cash. Concomitantly, the government urges that, in testing these corporate combinations for continuity of shareholder interest, the proprietary interests in Southern and Standard as they existed *prior* to OIC's purchases of stock must be compared to the proprietary interests in Security after Southern and Standard were dissolved. Of course, Southern's and Standard's original shareholders had *no* post-acquisition proprietary interest in Security; all the original shareholders of Southern and Standard were "cashed out." Accordingly, the government claims, the continuity of interest requirement was not satisfied, and Security is not entitled to favorable F reorganization treatment.

---

**10.** The IRS requirements for recognition of an F reorganization are similar. Rev.Rul. 75–561, 1975–2 C.B. 129, states that a combination of two or more corporations qualifies as an F reorganization if:

(1) There is complete identity of shareholders and their proprietary interests in the acquired corporation and the acquiring corporation;

(2) The acquired corporations and the acquiring corporation are engaged in the same business activities or integrated activities before the combination; and

(3) The business enterprise of the acquired corporations and the acquiring corporations continues unchanged after the combination.

**11.** For a review of the historical development of the continuity of interest requirement in the context of corporate reorganizations, see B. Bittker & J. Eustice, *supra,* ¶ 14.11.

The linchpin of the government's argument is the application of the step transaction doctrine. Unquestionably, if these transactions are amalgamated and viewed in their entirety, the continuity of interest requirement is not satisfied. In order to evaluate properly the government's argument, we therefore turn to an exposition of the step transaction doctrine.

## B. The Step Transaction Doctrine

### 1. Articulating the Standards

■ The step transaction doctrine is a corollary of the general tax principle that the incidence of taxation depends upon the substance of a transaction rather than its form. *See Kuper v. Commissioner,* 533 F.2d 152, 155 (5th Cir.1976) (citing cases). Under the step transaction doctrine, "the tax consequences of an interrelated series of transactions are not to be determined by viewing each of them in isolation but by considering them together as component parts of an overall plan." *Crenshaw v. United States,* 450 F.2d 472, 475 (5th Cir.1971). When considered individually, each step in the series may well escape taxation. The individual tax significance of each step is irrelevant, however, if the steps when viewed as a whole amount to a single taxable transaction. *Id.* at 476. "[Taxpayers] cannot compel a court to characterize the transaction solely upon the basis of a concentration on one facet of it when the totality of circumstances determines its tax status." *Id.* at 477.

The types of step transactions are as varied as the choreographer's art: there are two steps, waltzes, fox trots, and even Virginia reels. As a consequence, the courts' applications of the step transaction doctrine have been enigmatic. As the Seventh Circuit observed:

> The commentators have attempted to synthesize from judicial decisions several tests to determine whether the step transaction doctrine is applicable to a particular set of circumstances in order to combine a series of steps into one transaction for tax purposes. Unfortunately, these tests are notably abstruse—even for such an abstruse field as tax law.

*Redding v. Commissioner,* 630 F.2d 1169, 1175 (7th Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 338 (1981). Although no test seems to be universally accepted, it is possible to articulate several standards used by the courts in determining when and how to apply the step transaction doctrine. *See* B. Bittker & J. Eustice, *supra,* ¶ 14.51 (suggesting that different tests are applicable in different contexts).

The test most often invoked in connection with the application of the step transaction doctrine is the "end result" test. Under this test, "purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *King Enterprises, Inc. v. United States,* 418 F.2d 511, 516 (Ct.Cl.1969). As the Fifth Circuit has noted, when cases involve "a series of transactions *designed and executed* as parts of a unitary plan to achieve an *intended* result," the plans will be viewed as a whole "regardless of whether the effect of doing so is imposition of or relief from taxation." *Kanawha Gas & Utilities Co. v. Commissioner,* 214 F.2d 685, 691 (5th Cir.1954) (emphasis added). *See also Kuper,* 533 F.2d at 155–56; *Crenshaw,* 450 F.2d at 476; *Redwing Carriers, Inc. v. Tomlinson,* 399 F.2d 652, 658 (5th Cir.1968).

A second test for determining whether the step transaction doctrine applies is labelled the "interdependence" test. This test focuses on whether "the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Paul & Zimet, *Step Transactions,* in Selected Studies in Federal Taxation 200, 254 (2d Ser.1938), *quoted in King Enterprises,* 418 F.2d at 516. *See also Redding,* 630 F.2d at 1177; *American Bantam Car Co. v. Commissioner,* 11 T.C. 397 (1948), *aff'd per curiam,* 177 F.2d 513 (3d Cir.1949), *cert. denied,* 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344 (1950); 3 J. Mertens, *The Law of Federal Income Taxation* § 20.161 (Doheny

ed. 1981). When "it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts," *Kuper,* 533 F.2d at 156, step transaction treatment may be deemed appropriate.

The third and most restrictive test permitting invocation of the step transaction doctrine is the "binding commitment" test. The Supreme Court enunciated this standard in *Commissioner v. Gordon,* 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968), when it refused to aggregate stock distributions occurring several years apart for tax purposes. The Court commented that "if one transaction is to be characterized as a 'first step' there must be a binding commitment to take the later steps." *Id.* at 96, 88 S.Ct. at 1524. Thus the "binding commitment" test requires telescoping several steps into one transaction only if a binding commitment existed as to the second step at the time the first step was taken. Subsequent decisions, however, have tended to confine *Gordon* to its facts. The Seventh Circuit, for example, has concluded that lack of a "binding commitment" should be determinative only in cases involving multiyear transactions; in other situations, the presence or absence of a "binding commitment" is simply one factor to be considered. *See McDonald's Restaurants v. Commissioner,* 688 F.2d 520, 525 (7th Cir.1982); *Redding,* 630 F.2d at 1178. Similarly, the Court of Claims has read *Gordon*'s "binding commitment" requirement as limited to an interpretation of particular statutory language in section 355 concerning divisive reorganizations. *See King Enterprises,* 418 F.2d at 517–18. The *King* court reasoned:

> The opinion in *Gordon* contains not the slightest indication that the Supreme Court intended the binding commitment requirement as the touchstone of the step transaction doctrine in tax law .... Clearly, the step transaction doctrine would be a dead letter if restricted to situations where the parties were *bound* to take certain steps.

*Id.* at 518 (emphasis in original). *See also* B. Bittker & J. Eustice, *supra,* ¶ 14.51 (binding commitment standard may be reserved for situations where taxpayer rather than government invokes step transaction doctrine); Levin & Bowen, *Taxable and Tax-Free Two-Step Acquisitions and Minority Squeezeouts,* 33 Tax L.Rev. 425, 428 n.6 (1978) (*Gordon* limited to divestiture of control requirement in D reorganization).

We believe that both the "end result" test and the "interdependence" test are helpful in analyzing multiphase transactions in terms of the step transaction doctrine. Each is faithful to the central purpose of the step transaction doctrine: ensuring that the tax consequences of a particular transaction turn on substance rather than form. In prior cases involving step transaction treatment, the Fifth Circuit has employed both tests on various occasions. *See Kuper,* 533 F.2d at 155–56 ("end result" and "interdependence"); *Crenshaw,* 450 F.2d at 475–78 ("end result" and "interdependence"); *Kanawha Gas & Utilities Co.,* 214 F.2d 685, 691 ("end result"). Furthermore, we conclude that the *Gordon* "binding commitment" test should be strictly limited to the facts of the case that gave it life. General application of the "binding commitment" standard would effectively permit taxpayers to evade the step transaction doctrine merely by abstaining from formal commitments. Such a result, which would emasculate the doctrine itself, is in no way mandated by the *Gordon* opinion. *See King Enterprises,* 418 F.2d at 518. We therefore turn to an examination of the facts of this case in light of the "end result" and "interdependence" tests.

### 2. Applying the Standards

The government argues that the step transaction doctrine should be applied in this case to defeat F reorganization treatment of the acquisitions of Southern and Standard and the accompanying tax-free carryovers of their policyholders surplus accounts. In particular, the government asserts that the transactions involved in this case fail to satisfy the continuity of interest requirement of F reorganizations when scrutinized in terms of the step transaction doctrine. We have determined that

the "end result" test and the "interdependence" test are the appropriate standards to be used in deciding when to apply step transaction analysis. Accordingly, we must now apply the "end result" and "interdependence" tests to ascertain whether the step transaction doctrine governs the outcome of this case. We conclude that under *either* test the transactions involved here should be stepped together, and when viewed in such a way, the acquisitions of Southern and Standard fail to qualify as F reorganizations.

■ Under the "end result" standard of step transaction analysis, purportedly separate transactions are to be amalgamated when the successive steps were designed and executed as part of a plan to achieve an intended result. *Kanawha Gas & Utilities Co.*, 214 F.2d at 691. In this case we are faced with a dizzying array of legal maneuvers: OIC's purchases of Southern's and Standard's stock, the reinsurance agreements between Southern, Standard, and Security, the transfers of Southern's and Security's assets through OIC to Security, and, finally, the liquidations of Southern and Security under state law. Yet all these machinations cannot disguise the fact that

the intended result of each series of transactions was the acquisition of Southern's and Standard's assets by Security. Security and OIC left a clear and well-documented paper trail to this effect.[12] Security's game plans for acquiring Southern and Standard were identical to the strategy it had pursued for over twenty years: liquidate the rival company and gobble up the assets. Such a plan of acquisition amounts to nothing more than a taxable cash purchase by Security of Southern's and Standard's assets. "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474 (1938). Thus these transactions must be viewed in their entireties under the "end result" test of the step transaction doctrine.

■ The "interdependence" test for applying step transaction analysis asks whether the individual steps in a series had independent significance or whether they had meaning only as part of the larger transaction. This test concentrates on the relationship between the steps, rather than

**12.** All negotiations in connection with the acquisition of Southern were conducted by Ourso in Security's name. Security arranged the necessary financing with the Bank prior to making an offer to the Southern shareholders; the Bank's confirmation of the borrowing agreement noted that "[i]t is recognized by us that it would be your intention to merge the companies if you were successful with your purchase arrangements." The initial purchase offer to Southern's shareholders was made by Security as well. OIC was not even incorporated under state law until December 21, 1970, well after these preliminary negotiations had transpired. The formation of OIC did not disrupt the plan Security had set in motion. On January 2, 1970, two days *before* the Southern shares were tendered, the OIC board of directors resolved to liquidate Southern as soon as OIC acquired control. Immediately upon acquiring all the Southern shares, OIC (as Southern's sole shareholder) resolved to liquidate Southern; Ourso, as Southern's liquidator, entered into a reinsurance agreement with Security. Within 48 hours after OIC acquired the Southern shares, OIC had "cashed out" the Southern shareholders, paid off a portion of its acquisition-related debt with the proceeds of South-

ern's net worth and surplus, and transferred Southern's assets to Security.

The Standard acquisition differed from that of Southern only in that OIC, not Security, participated in the initial negotiations. On October 19, 1971, a week before OIC acquired the Standard shares, the OIC board resolved to liquidate Standard immediately upon acquiring control. On October 25, 1971, the very day the shares were purchased, OIC (as Standard's sole shareholder) resolved to liquidate Standard. One week later, on November 3, 1971, Standard in effect sold its assets to Security by means of a reinsurance agreement. All of Standard's operating assets were transferred to Security by December 31, 1971. In slightly over two months, Standard's shareholders were eliminated, its net worth and surplus were liquidated to pay off OIC's purchase money loan, and its assets were transferred to Security.

As both parties noted at oral argument, these documentary facts are undisputed. In light of the state of this record, any conclusion other than an intention to liquidate would be clearly erroneous. Consequently, we find it unnecessary to remand for findings of fact on this point.

on their "end result." *McDonald's Restaurants,* 688 F.2d at 524. Thus, under this test we examine this tandem of transactional totalities to determine whether each step had a reasoned economic justification standing alone. An analysis of the transactions at issue in this case indicates that each step was dependent for its success upon each of the others; in isolation, the steps were meaningless. OIC was a mere shell, formed only to facilitate the purchases of Southern and Standard. The purchases of Southern and Standard would have been impossible without elaborate financing arrangements between OIC and the Bank; these financing agreements were dependent in part on the contingent payment agreements and reinsurance agreements between the various parties, because the collateral agreements guaranteed that OIC would have a cash flow sufficient to discharge its debt to the Bank. The transfers of assets from Southern and Standard to Security were necessary to effectuate the reinsurance agreements with Security. These complicated interrelationships demonstrate that each step in the transactions led inexorably to the next. Such a symbiotic relationship clearly satisfies the "interdependence" test for application of the step transaction doctrine.

Analysis of the Southern and Standard acquisitions under the "end result" test indicates that each element of the transactions was designed and executed as part of Security's plan to acquire the assets of Southern and Standard. Application of the "interdependence" test to these transactions reveals individual components so interrelated that no single step would likely have been taken had the others not followed. Thus, under either of the two prevailing standards used to determine whether step transaction analysis should be applied, the events that transpired in connection with the acquisitions of Southern and Standard should be amalgamated and viewed as a single transaction.

### C. Summary

As discussed above, both the "end result" test and the "interdependence" test require that we view the Southern and Standard acquisitions through the telescopic lens of the step transaction doctrine. Specifically, we must incorporate this composite perspective of the acquisitions into our evaluation of the continuity of interest requirement of F reorganizations. When the acquisitions are examined in the step transaction context, they clearly fail to satisfy the requirement of continuity of proprietary interest. The original shareholders of Southern and Standard were eliminated from the continuity of interest calculus by OIC's purchases of the Southern and Standard shares. No former shareholder of Southern or Standard retained a proprietary interest in Security following these transactions. Such complete "cash outs" of the Southern and Standard shareholders cannot qualify as F reorganizations, because "a substantial shift in the proprietary interest in a corporation accompanying a reorganization can hardly be characterized as a mere change in identity or form." *Davant,* 366 F.2d at 883.[13]

Thus, in each of the acquisitions challenged here, the original stock purchase, the transfer of assets, and the ultimate liquidation must be aggregated for tax purposes under the step transaction doctrine. So aggregated, these transactions do not satisfy the requirements of an F reorganization because the necessary continuity of proprietary interest was lacking. *See* Levin & Bowen, *supra,* at 475–77 (concluding that a similar multi-step transaction is not an F reorganization due to lack of continuity of interest). The district court held that F reorganizations had occurred without considering the application of the step transaction doctrine to these facts. In so doing, the district court erred in failing to apply

---

13. *Cf. Aetna Casualty & Sur. Co. v. United States,* 568 F.2d 811 (2d Cir.1976), *reh'g denied,* 77–1 U.S.Tax Cas. (CCH) ¶ 9261 (F reorganiza-tion treatment allowed, for purposes of net operating loss carryover only, where identity of

the correct legal standard.[14] Accordingly, we reverse the district court and hold that the acquisitions of Southern and Standard do not qualify as F reorganizations. Security's claim of entitlement to tax-free carryovers of Southern's and Standard's policyholders surplus accounts by virtue of F reorganization treatment must therefore fail.

## V. THE LIQUIDATION THEORY

Although we hold that Security's acquisitions of Southern and Standard do not warrant F reorganization treatment, our inquiry does not end here, for an alternative statutory ground may support Security's attempt to carry over the policyholders surplus accounts. Section 381(a) permits the carryover of certain tax attributes from an acquired corporation to an acquiring corporation under two sets of circumstances: (1) when the acquisition is a reorganization described in section 368(a)(1)(A), (C), (D), (F), or (G); or (2) when the acquisition is a complete liquidation under section 332 to which the basis rule of section 334(b)(2) does not apply. Thus, even if the acquisitions of Southern and Standard are not F reorganizations, Security may carry over the policyholders surplus accounts if the transactions involving Southern and Standard are construed as the type of liquidation permissible under section 381(a).

Section 332 governs the complete liquidation of a subsidiary by its parent and provides the general rule that a parent corporation recognizes no gain or loss upon the receipt of property from its liquidated subsidiary. I.R.C. § 332(a). In order for section 332 to apply, the parent corporation must own eighty percent of the stock of its subsidiary. I.R.C. § 332(b).

Section 334(b)(2) determines the basis of the property received by a parent corporation upon the liquidation of its controlled subsidiary pursuant to section 332. The general rule of section 334(b)(1) imposes a carryover basis rule; the basis of the property in the hands of the parent corporation following a section 332 liquidation is the same as the pre-liquidation basis of the property in the hands of the subsidiary. Section 334(b)(2) provides an exception to this general rule, to be applied when the parent corporation acquired at least eighty percent of the stock of the subsidiary by purchase during a period of not more than twelve months and the liquidation is undertaken pursuant to a plan of complete liquidation adopted not more than two years after the purchase. When section 334(b)(2) applies, the parent corporation's basis for the property acquired in a section 332 transaction is the cost of the subsidiary's stock to the parent.[15] An objective test governs the application of the basis rule of section 334(b)(2); if the liquidation satisfies the statutory conditions, the subsidiary's assets acquire a new basis in the hands of the parent corporation. *In re Chrome Plate, Inc.,* 614 F.2d 990, 995 (5th Cir.1980) (citing cases); *Kansas Sand & Concrete, Inc. v. Commissioner,* 462 F.2d 805, 808 (10th Cir.

shareholder interests between acquired and acquiring corporations measured only 61.1%).

14. Some language in the district court's opinion is reminiscent of step transaction analysis. For example, the district court observed that "[p]rior to OIC's purchase of Southern's stock, there was no binding commitment to merge Southern with Security, nor was there a definite commitment to liquidate Southern." The court also noted that "the liquidation and merger were in no way foreordained at the time OIC acquired Standard." Thus the district court arguably addressed the step transaction issue sub silentio. As we explain in text, however, *supra* at 1245, the "binding commitment" test has been limited in application to a narrow category of cases to which this case does not belong; accordingly, the district court's re-

liance on the absence of any binding commitments was misplaced. Furthermore, to the extent the district court applied the "end result" test, its finding that the various steps in these transactions were not foreordained must be considered clearly erroneous in light of the ample documentation to the contrary and the immediacy with which the plans were executed.

15. For a history of the evolution of the rule of § 334(b)(2), see B. Bittker & J. Eustice, *supra,* ¶ 11.44(2). As for the future of § 334(b)(2), see Tax Equity and Fiscal Responsibility Act of 1982, § 224(b), Pub.L. No. 97–248, 1982 U.S. Code Cong. & Ad.News (96 Stat.) 10, 167–68 (repealing § 334(b)(2)).

1972); *Estate of Glass v. Commissioner,* 460 F.2d 321, 322 (5th Cir.1972).

Security argues that it acquired the assets of Southern and Standard in complete liquidations under section 332 to which section 334(b)(2) does not apply. At no time, however, was Security the "parent" of Southern or Standard within the meaning of section 332. *See* I.R.C. § 332(b) (requiring eighty percent stock ownership to establish parent-subsidiary relationship). Therefore, in order for the liquidation argument to succeed, Security must show that:

(1) The liquidations of Southern and Standard and the transfers of their assets to *OIC* were section 332 complete liquidations to which section 334(b)(2) does not apply; and

(2) The favorable tax treatment of Southern's and Standard's policyholders surplus accounts accruing to OIC from such liquidations was transferred from OIC to Security when Security acquired the assets of Southern and Standard.

 We find it unnecessary to address the second leg of this analysis, for we conclude that the liquidations of Southern and Standard by OIC fell squarely within the statutory framework of section 334(b)(2). OIC was the parent of both Southern and Standard, having acquired more than the required eighty percent of the stock of each corporation within the statutory twelve-month time span. *See* I.R.C. §§ 332(b), 334(b)(2)(B). The plans to liquidate Southern and Standard were adopted within two years of the stock purchases; in fact, in each case the plan of liquidation was adopted within days of the stock acquisition. *See* I.R.C. § 334(b)(2)(A). Finally, OIC received all the property of Southern and Standard in distributions in complete liquidation of the two corporations. I.R.C. § 334(b)(2). This sequence of events illustrates a paradigmatic section 332 liquidation of a subsidiary by a parent subject to the basis rule of section 334(b)(2). Under established precedent, if a corporate transaction complies with the provisions of section 334(b)(2), the special rule of that section applies automatically. *Chrome Plate,* 614 F.2d at 995;

*Kansas Sand,* 462 F.2d at 808; *Estate of Glass,* 460 F.2d at 322.

We hold, therefore, that the liquidations of Southern and Standard by OIC were section 332 complete liquidations to which section 334(b)(2) does apply. Consequently, Security cannot claim entitlement to the carryovers of Southern's and Standard's policyholders surplus accounts on the basis of the liquidation leg of section 381(a). As we have previously determined, Security also fails to qualify for the carryovers under the alternative segment of section 381(a) because the acquisitions of Southern and Standard did not satisfy the requirements of F reorganizations. Thus, under section 815(d)(2)(A), Southern and Standard must include in taxable income the amounts remaining in their policyholders surplus accounts at the end of the taxable years preceding their respective terminations as insurance companies. The question remains, however, whether Security is liable for the additional tax owed by Southern and Standard as a result of the inclusion of the policyholders surplus accounts in their final computations of taxable income.

## VI. SECURITY'S TAX LIABILITY

We now turn to the final questions raised by this appeal, which concern the validity of the tax assessments levied against Security by the IRS. Security argues that the assessments are faulty for two reasons. Security first asserts that the deficiencies were assessed against it for the wrong taxable years. In addition, Security claims that it is not liable for any tax owed by Southern and Standard because it is not a transferee within the meaning of section 6901; Security further contends that the transferee liability forms signed by Ourso are invalid. For these reasons, Security claims that it is entitled to its refund regardless of whether Southern and Standard must include their policyholders surplus accounts in taxable income. We shall address each of these arguments in turn.

### A. *Proper Taxable Years*

Section 815(d)(2)(A) provides that, "if for any taxable year [a life insurance company]

is not an insurance company," it must include its policyholders surplus account in its computation of taxable income "for the last preceding taxable year for which it was a life insurance company." I.R.C. § 815(d)(2)(A). The IRS issued deficiency notices as to Southern for its taxable year 1970 and as to Standard for its taxable year 1971. Security contends that these deficiencies were improperly assessed, arguing that 1970 was not the last year for which Southern was an insurance company and that 1971 was not the last year for which Standard was an insurance company. We find Security's argument to be without merit.

The definition of "insurance company" found in the pertinent regulations provides as follows:

> The term "insurance company" means a company whose primary and predominant business activity during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. Thus, though its name, charter powers, and subjection to state insurance laws are significant in determining the business which a company is authorized and intends to carry on, it is the character of the business actually done in the taxable year which determines whether a company is taxable as an insurance company under the Internal Revenue Code.

Treas.Reg. § 1.801–3(a). *See also Industrial Life Insurance Co. v. United States,* 344 F.Supp. 870, 875 (D.S.C.1972), *aff'd* 481 F.2d 609 (4th Cir.1973); *Cardinal Life Insurance Co. v. United States,* 300 F.Supp. 387, 391–92 (N.D.Tex.1969).

▪ An examination of "the character of the business actually done" by Southern in 1971 and by Standard in 1972 refutes Security's contention that they were insurance companies for those years. Southern transferred all its assets to OIC on January 5, 1971 and filed its "Final Return" on June 12, 1971, for its taxable year 1970. No

further income tax returns were filed by Southern. In the case of Standard, the transfer of assets was completed on December 31, 1971. Standard's "Final Return," for its taxable year 1971, was filed on April 24, 1972, and no other income tax returns were ever filed on its behalf. Neither Southern in 1971 nor Standard in 1972 were engaged in issuing "insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies." *See* Treas.Reg. § 1.801–3(a). Thus, we hold that Southern and Standard were not insurance companies for income tax purposes during 1970 and 1971, respectively, and that the notices of deficiency were issued for the proper taxable years.

### B. *Security's Transferee Liability*

Security finally presses two additional bases for its position that it is not liable for any additional tax owed by Southern and Standard as a result of the inclusion of their policyholders surplus accounts in income. First, Security contends that it is not a transferee of Southern or Standard within the meaning of section 6901 and therefore was not the proper party against whom any transferee liability should have been assessed. Second, Security claims that the undated transferee liability forms purporting to impose such liability upon Security were executed after the statute of limitations had expired and consequently are invalid. We cannot agree with either of these contentions.

▪ Security's attempt to deny transferee status in this case [16] is disingenuous at best. Ourso, as president of Security, executed two transferee agreements on revised Internal Revenue Service Forms 2045 in consideration of the IRS not making assessments of deficiency against OIC. In the transferee agreements, Security admitted that it was the transferee of assets from Southern and Security by way of OIC; furthermore, Security assumed and agreed to pay any federal income tax determined to

---

**16.** Briefly, Security's argument is that it cannot be a transferee under I.R.C. § 6901(h), which defines a transferee as a "donee, heir, legatee, devisee, [or] distributee," because it was a good faith purchaser of the Southern and Standard assets for value from OIC.

be owed by Southern for 1970 and Security for 1971. Security is bound by these transferee agreements and may not now renounce its assumptions of transferee liability. It is as clear as words can make it that Security assumed Southern's and Standard's tax liability, and Security is estopped from contending otherwise. *Turnbull, Inc. v. Commissioner,* 373 F.2d 91, 94 (5th Cir. 1967); *see also West Texas Refining & Development Co. v. Commissioner,* 68 F.2d 77, 81 (10th Cir.1933).

■■■ Finally, we reject Security's suggestion that the undated transferee agreements are invalid because they were executed after the statute of limitations had expired.[17] The running of the statute of limitations is an affirmative defense that may be raised by a transferee to defeat transferee liability, 9 J. Mertens, *supra,* § 53.47 (citing cases), and the party asserting the bar of the statute of limitations has the burden of proof on that issue. *Id.* At trial, the IRS agent involved in the matter testified that he mailed the transferee agreements to Ourso on March 22, 1973, and that they were executed and returned to him before April 10, 1973. Record on Appeal, Vol. III at 278–79. The only other testimony on point was offered by Ourso himself. At first, Ourso had no recollection of the date the documents were signed. *Id.* at 96–97. Later, however, in response to his counsel's leading question, he related the date of his signing of the transferee liability documents to the date of the actual payment of the deficiencies, in the fall of 1975. *Id.* at 316. Ourso's testimony is far too tenuous to satisfy Security's burden of establishing a statute of limitations defense, particularly in light of the government's evidence to the contrary. Accordingly, we conclude that Security has failed to carry its burden of proof on the statute of limitations defense. We hold, therefore, that Security, as transferee of Southern and Standard, is liable for the tax deficiencies assessed in connection with the inclusion of the policyholders surplus accounts in income.

## VII. CONCLUSION

From its very inception, the Code has been charitable in its treatment of life insurance companies. This is not to say, however, that life insurance companies are completely shaded from the Code's ever-watchful collecting eye; to the contrary, insurance companies are subject to the Code's alphabet soup just as other corporate organizations are. Security's juggling acts with these policyholders surplus accounts may not be legitimated with the labels "reorganization" or "liquidation" when those labels do not apply. Only if Security dances to the Codal choreography is it entitled to favorable tax treatment.

To summarize this overlong and complex opinion, we hold that Southern and Standard must include in their computations of life insurance taxable income for 1970 and 1971, respectively, the amounts contained in their policyholders surplus accounts. This inclusion in income is required because the acquisitions of Southern and Standard by Security failed to satisfy the requirements of either F reorganizations or section 334(b)(2) liquidations. Further, we hold that the IRS assessed the deficiencies in issue for the proper taxable years and that Security, as transferee of Southern and Standard, is liable for those deficiencies.

---

**17.** Section 6901(c) provides that the period of limitations for assessment of transferee liability shall be as follows:

(1) Initial transferee.—In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor;

(2) Transferee of transferee.—In the case of the liability of a transferee of a transferee, within 1 year after the expiration of the period of limitation for assessment against the preceding transferee, but not more than 3 years after the expiration of the period of limitation for assessment against the initial transferor.

In this case, the § 6901 limitations period would have expired on March 15, 1975, as to Southern and on March 15, 1976, as to Standard. Because the transferee liability agreements signed by Ourso are undated, Security argues that the government has failed to show that the documents were signed before the statute of limitations had expired.

# 1252

Accordingly, the district court is hereby reversed, and judgment is rendered for the government.

REVERSED AND RENDERED.