In re PLACID OIL COMPANY, Debtor.

Bankruptcy No. 386–33419–HCA–11.

In the United States Bankruptcy Court, N.D. Texas, Dallas Division.

Aug. 21, 1990.

See also, 102 B.R. 538; 140 B.R. 122.

determine a claim or cause of action removed pursuant to 28 U.S.C. § 1452.

Khent H. Rowtan, Simon, Anisman, Doby, Wilson & Skillern, Fort Worth, Tex., for debtor.

Grover Hartt, III, Tax Div., Dept. of Justice, Dallas, Tex., for U.S.

## MEMORANDUM OPINION

HAROLD C. ABRAMSON, Bankruptcy Judge.

This dispute arises in the context of Placid Oil Company's ("Placid's") Objection to Administrative Claim Filed by the Internal Revenue Service ("Objection"). Appearing on behalf of Placid were Khent Rowton and Richard Bruse of the law firm of Simon, Anisman, Doby, Wilson & Skillern. The Department of Revenue (referred to herein as the "Government" and the "IRS") was represented by Grover Hartt and Lillian Brigman of the Department of Justice, Tax Division.

The Court has read the briefs and related documents submitted by counsel, heard the evidence presented, and the arguments of counsel and in light of the argument and evidence presented at trial finds in favor of the Internal Revenue Service.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157. The following represents the Court's findings of facts and conclusions of law. Although written in narrative form, this document is intended to comply to Bankruptcy Rule 7052.

### I. PROCEDURAL HISTORY

Placid filed for relief under Title 11 Chapter 11 of the United States Bankruptcy Code on August 29, 1986. On September 30, 1988, this Court entered its Order confirming the Modified Fourth Amended Joint Plan of Reorganization of Placid Oil Company, et al. (the "Plan"). The Plan provided a bar date for the filing of administrative claims, and on December 7, 1988, the IRS filed its Administrative Claim in the amount of $12,327,919.50. Placid responded with an objection to the claim filed on December 16, 1988, which was later amended. The Administrative Claim pur-

ports to cover tax deficiencies for tax years 1986 and 1987, including accrued interest.

## II. FINDINGS OF FACT

This matter arises out of a loss claimed by Placid on its 1986 tax return. Placid Oil Company, United Kingdom ("Placid, U.K."), a subsidiary of Placid, deducted as a loss the sale of certain license interests in Blocks 16/121, 211/8 and 29/2 in the United Kingdom sector of the North Sea (the "License Interests"). The IRS challenged Placid's loss deduction of $16,078,527.00 on the grounds that, *inter alia*, it originated in a transaction which did not give rise to a recognizable loss for tax purposes. To elucidate the tax problem, the Court shall develop the events and transaction which gave rise to the claimed deduction.

### The Corporate Separation

The issued and outstanding shares of stock of Placid were owned by six trust estates: The N.B. Hunt, Jr. Trust Estate, the W.H. Hunt Trust Estate, the Margaret Hunt Trust Estate, the Lamar Hunt Trust Estate, the H.L. Hunt, Jr. Trust Estate, and the Caroline Hunt Trust Estate. In early 1982, the shareholders of Placid determined to effect a separation of Placid's assets among its various shareholders. This separation involved a transfer of the License Interests.

As part of this separation the shareholders created new corporations, Rosewood Resources Inc., owned by the Caroline Hunt Trust and Britannia–Hunt Exploration, Ltd., owned by the Margaret Hunt and the H.L. Hunt Trusts. These newly formed corporations received a percentage of what were formerly Placid's assets. Placid, U.K., Placid's British subsidiary, transferred 35.7% of its License Interests to its parent, Placid.[1] Placid then transfer-

red 18.97% of the 35.7% to newly created Rosewood Resources, Inc. U.K. ("Rosewood"), a wholly owned subsidiary of Rosewood Resources, Inc. As the same time, Placid transferred 16.8% of its License Interests to Britannia–Hunt Exploration, Ltd. ("Britannia–Hunt"), a wholly owned subsidiary of Hunt Petroleum Corporation ("HPC")[2]. In 1983, Britannia–Hunt paid Placid, U.K. $12,549,658 for the license interests which became Britannia–Hunt's only tangible assets.

The Corporate Separation was somewhat complicated by United Kingdom Department of Energy (the "Department") requirements. The Department required that a company employ a certain number of individuals in the United Kingdom to qualify as a "corporate presence" in order to be recognized by the Department of Energy as a named licensee for North Sea Oil exploration purposes.[3] The Department had, at one time, indicated that it would recognize Rosewood and Britannia–Hunt as named licensees for oil exploration purposes. However, just prior to the conclusion of the separation, the Department took a contrary position and indicated that it would not recognize Rosewood or Britannia–Hunt as named licensees for oil exploration in the North Sea due to their lack of corporate presence. The testimony presented indicated that neither Rosewood nor Britannia–Hunt found compliance with the corporate presence requirement economically feasible. As a result, Placid, U.K., which qualified under Department requirements, retained its status as the named licensee and conveyed to Rosewood and Britannia–Hunt only beneficial interests in the licenses. By virtue of the separation agreements, and as a result of the corporate separation, Placid, U.K. was "trustee" for Rosewood and Britannia–Hunt with respect to the License Interests.

1. Placid, U.K. held a certain percentage in the License Interests at issue. Placid, U.K. did not own 100% of those License Interests. Of that portion which Placid, U.K. owned prior to 1983, it transferred a total of 35.7% to its Parent, Placid, which in turn, transferred 35.7% of those interests to the other corporations. Placid, U.K. retained 64.3% of its interests in those licenses.

2. At the time of the Corporate Separation, HPC was known as "Louisiana–Hunt Petroleum Corporation."

3. Apparently, qualification as a "named licensee" carries with it many burdens and benefits with respect to oil exploration.

*The Sale of Rosewood License Interests*

In October 1985, Rosewood determined to sell its License Interests. Rosewood's sale of its License Interests created some controversy due to the existence of pre-emptive rights owned by parties to the applicable operating agreement for the North Sea licenses at issue. Notwithstanding the pre-emptive rights, Trafalgar House Oil and Gas ("Trafalgar"), which was not a party to those agreements, purchased Rosewood's License Interests. Due to the preemptive rights issue, the other parties under the operating agreements took the position that Rosewood, and consequently, Trafalgar, as beneficial interest owners, did not own anything at all. The operators then refused to recognize Trafalgar as an interest holder in the Licenses. To settle this dispute, Trafalgar ultimately, years later, transferred 25% of the interest acquired from Rosewood to the Sun and Occidental Group.

*The Sale of Britannia's License Interests*

In 1985 Britannia–Hunt desired to divest itself of all of its North Sea interests. Ultimately, by agreements executed on July 11, 1986, Placid, U.K. sold to North Sea Sun Oil Company, Occidental Petroleum Company, Conoco, and London & Scottish Marine Oil (collectively referred to as the "Sun–Oxy Group"), an undivided 16.8% license interests in P047 (valued at $1), P224 (valued at $399,999), and P212 (valued at $6 million) for $6,000,000 in cash and a $400,-000 note. The 16.8% transferred to the Sun–Oxy Group was a portion of Placid, U.K.'s own interests. Placid, U.K. then acquired all of the stock of Britannia–Hunt

from HPC for $6.4 million dollars. In so doing, Placid, U.K. acquired Britannia's License Interests in P212, P224, P361, and P047.[4]

*Calculation of the Loss Deduction*

Placid, through its subsidiary Placid, U.K. and by way of a consolidated tax return, claimed a loss of $16,078,527 on the sale of the License Interests. The deduction was the result of a reduction in basis in the property sold to the Sun–Oxy Group. Placid claimed its basis in the License Interests was $22,478,527. Placid deducted the amount derived from the sale of its License Interests ($6.4 million dollars).[5]

## III. ISSUE

The fundamental issue for determination is relatively simple: Whether a corporation, acting as a vehicle for a separate entity, sells its own assets to a third party and obtains virtually identical assets from that entity by acquisition of stock, is entitled to a loss deduction which may result from the sale.

## IV. DISCUSSION OF LAW

### A. The Proof Required

■ At the outset the Court must address the burdens of proof which surround the consideration of this claim in Bankruptcy Court. The Court acknowledges that Placid would bear the final burden of proof in another forum.[6] In Tax Court, the burden of proof has been judicially established due to inherent conflicts between the taxpayer and the Internal Revenue Service

---

**4.** Placid, U.K. did not divest its interest in license P361. That license was withdrawn from the sale to the Sun–Oxy Group due to the then pending litigation relating to the drilling and exploration of that license. The Sun–Oxy Group sought an indemnification agreement from Placid with respect to that property and the possible liability associated with that interest. Placid, U.K. declined to provide such indemnification, and therefore, continued to hold the property.

**5.**

| Amount Received from the Sale of L.I.: | $ 6,400,000 |
|---|---|

| Placid's Basis in the License Interests: | <$ 22,478,527> |
| Loss: | <$ 16,078,527> |

**6.** Deductions allowed by the Internal Revenue Code are a matter of legislative grace. *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). The taxpayer bears the burden of showing his or her entitlement to a particular deduction. *C.A. White Trucking Co., Inc. v. Commissioner,* 601 F.2d 867, 869 (5th Cir.1979), *Cagle v. Commissioner,* 539 F.2d 409, 416 (5th Cir.1976).

**134**

and policy considerations regarding the protection of the public fisc. While Tax Court responds to the bidding of the Tax Code and its policies, the Bankruptcy Court responds to the Bankruptcy Code and the policies promulgated thereunder.

The Government's proof of claim constitutes prima facie evidence of the claim's validity and amount under Bankruptcy Rule 3001. The Government's original and amended proofs of claim contain no documentary evidence, but are merely composed of assertions of assessments following the filing of Placid's bankruptcy petition. The objection filed by Placid initiated a contested matter under Bankruptcy Rule 9014. As the objecting party, Placid has the burden of producing enough evidence to rebut the claim of the government. *In re Fidelity Holding Co. Ltd. (California State Board of Equalization v. Official Unsecured Creditor's Committee)*, 837 F.2d 696, 698 (5th Cir.1988).

Placid must produce evidence that is "of probative force equal to that of the creditor's proof of claim."[7] Placid's amended objection to the IRS' corresponding proofs of claim consists of a discussion of the disallowed deductions and Placid's reasons why the deductions should be allowed. The Court finds Placid's evidence on the amended objection adequate to rebut the government's prima facie case. The burden then shifts back to the claimant, to prove the claim by the preponderance of the evidence. The IRS, as claimant, carries the ultimate burden of persuasion. *In re Fidelity Holding Co., Ltd.*, 837 F.2d at 698.

Bankruptcy laws, formulated by Congress, carry an underlying policy which encourages a fresh start or reorganization of a bankrupt. Although the Code does provide for some favorable treatment of taxing authorities as creditors,[8] neither the Code nor the Rules prescribe diminished burdens of proof for claims of the government.

### B. The Question of Deductibility

■ The IRS contests Placid U.K.'s right to claim a deduction for the assets sold on a number of grounds. First it argues that given the totality of the circumstances, Placid, U.K. did not sustain an economic loss. Second, the Government argues that Placid, U.K. acted as a mere conduit to facilitate Britannia–Hunt's sale of its assets to a third party. Third, the Government argues that Placid, U.K. acquired what it gave away and so should not be entitled to recognize a loss. Finally, the Government argues that Placid, U.K. must treat this matter in the same manner for financial and tax accounting purposes; and that Placid U.K.'s treatment of this sale as a "wash" for financial accounting purposes precludes its treating the sale as a "loss" for tax accounting purposes. Placid, U.K. argues that because it had valid business reasons for its participation in the sale of assets, and conducted the sale without regard for United States tax ramifications, it is entitled to a loss deduction.

The general tax provision governing deductions is at 26 U.S.C. § 165 and states: "a taxpayer may deduct any loss sustained during the taxable year for which the taxpayer is not indemnified by insurance or otherwise." Loss is to be recognized unless an applicable nonrecognition statute applies.

> In the final analysis, the amount of evidence necessary to rebut a presumption will vary depending upon such factors as the policy reasons favoring the presumption, the strength of the evidence supporting the presumption, and the quality and believability of the rebutting evidence.
> Russell, *Bankruptcy Evidence Manual*, § 301.3 p. 42 (West 1987).

---

7. *In re Simmons*, 765 F.2d 547, 552 (5th Cir. 1985). Collier has observed:

 While the burden of ultimate persuasion is always on the claimant, and while probative force is given to the allegations in that creditor's proof of claim, the trustee nonetheless carries the burden of going forward to meet, overcome, or at least equalize, what operates in favor of the creditor by the force of section 502(a) and the Rule. 3 *Collier on Bankruptcy*, ¶ 502.01 p. 502–17 (15th ed. 1989). Another commentator on this subject has observed that,

8. E.g., Section 507 priorities.

1. The Sham Transaction Doctrine: Economic Loss and Bona Fide Loss

a. *The Sham Transaction Doctrine*

 Only a bona fide loss is an allowed tax deduction. Substance and not mere form shall govern in determining a deductible loss. Under 26 U.S.C. § 165 and the regulations promulgated thereunder, four factors must be present to qualify as deduction: (1) there must be an actual loss, (2) the loss must be sustained by the taxpayer, (3) the loss must be sustained in a closed transaction during the taxable year; and (4) the loss must not be compensated for by insurance. The closed nature of the transaction and presence of insurance indemnification are not issues in this case.

 The relevant consideration before the Court is whether Placid sustained an "actual loss." The term "loss" is not defined in the Tax Code, but in vague terms it is parting with value of an asset. *Williamson v. Commissioner of Internal Revenue*, 100 F.2d 735 (6th Cir.1938). No deduction is allowed under the Code unless the taxpayer in fact suffered a loss. The loss must be a bona fide loss representing a real change of position in a true economic sense; substance rather than form governs in determining a deductible loss. Treas. Reg. § 1.165(b) (1987).

 A fundamental tenet of tax law requires that courts, in analyzing the tax consequences of a transaction, should look to the substance of the transaction and not the form. *Gregory v. Helverling*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). A transaction will not be disregarded merely because it was entered into for tax saving motives if it otherwise has real substance. *Gregory v. Heiverling*, 293 U.S. 465, 479, 55 S.Ct. 266, 298, 79 L.Ed. 596 (1935). Elements of control, intent and tax motives are examined in determining the ultimate tax treatment of a transaction.

The evidence established that in October of 1985, Placid, U.K. and Britannia–Hunt concurrently offered to sell one hundred percent of each entities License Interests. However, Placid, U.K. later determined not to sell its interests, because it found the offered sale price too low.

In November of 1985, the Sun–Oxy Group, became interested in acquiring Britannia–Hunt's license interests in the North Sea. On February 5, 1986, by Telex at its Dallas headquarters, HPC as sole shareholder of Britannia–Hunt, received a firm offer from North Sea Sun Oil, Occidential Oil, and Grand Metropolitan Oil for the bulk of Britannia's assets. HPC accepted this offer.

In February of 1986, after Britannia–Hunt and the proposed purchasers had reached an agreement in principle, Britannia–Hunt's London solicitors began earnestly examining ways in which to structure the transaction. It was concluded that problems existed with respect to the outright sale of Britannia–Hunt's assets. Two areas required redress: (1) The commercial objections of the other operators [9]; and (2) the United Kingdom tax position of Britannia–Hunt.[10] These factors led Britannia–Hunt's London solicitors the conclusion that the best way to dispose of Britannia–Hunt's assets was to sell 100% of the stock in the corporation.

This directive created another wrinkle in the disposition because, as a result, Britannia–Hunt, no longer interested an outright sale of its assets, had committed to a sale. The sale of stock presented difficulty because it was perceived that purchasers, acting as a group, would have tax problems in later separating the interests. No evidence was introduced to indicate that the Sun–Oxy Group was offered stock of Britannia–

---

9. Other operators refused to recognize Britannia–Hunt as having any interest whatsoever. If any asset were sold, Placid, U.K. would have been required to participate because it was a party to the operating agreement. (Placid Tr. Ex. 19 and 26).

10. The transfer to Britannia in 1983 had resulted in a valuation of its sole asset at a Low basis (roughly $500,000) while Britannia's basis in stock had been given a high basis (roughly $12.6 million). The sale of the asset would have resulted a taxable gain of 30% on the amount over the basis in the asset (in this case 30% of § 6.5 million minus $500,000, or 30% of $6 million).

Hunt. To the contrary, in a memorandum dated November 8, 1985, the purchasers of the assets on the subject of "bidding strategy" stated:

It has been asked of Placid whether the interests would be sold by way of an asset sale or a stock sale. The telex received from Placid on 6th November confirms that the sale contemplated by their 17th October telex is an asset and not a stock sale.... (Placid Tr.Ex. 18)

Testimony at trial indicated that the structure of the transaction made the possibility of Britannia–Hunt's disposal of its interests seem remote. Allegedly, James Parker, the President of Britannia–Hunt, serendipitously hit upon the idea to place Placid, U.K. in the center of the transaction. However, the IRS produced controverting evidence which indicated that the parties had contemplated Placid, U.K.'s involvement in the earlier Rosewood disposition. Moreover, because of the trust relationship between the Placid, U.K. and Britannia–Hunt, it would have been necessary for Placid, U.K. to have some direct involvement in any sale of Britannia–Hunt property.[11]

### b. Economic Purpose

■ To determine whether economic substance is present, courts examine the objective realities of a transaction. *See, Merryman v. Commissioner of Internal Revenue*, 873 F.2d 879, 881 (5th Cir.1989). This question addresses the transaction from the standpoint of the business purpose behind the transaction. Courts ask whether the transaction at issue was entered for a valid, profit motivated, or business motivated reason. A more probing question is whether a transaction might occur in a bona fide business setting. *Merryman*, 873 F.2d at 881.

Placid, U.K. does not allege that its sale of its assets was profit motivated. Indeed, Placid, U.K. alleges that it participated in the 1986 transfer of assets because of valid business concerns which arose out of its trust relationship with Britannia–Hunt, and further that United States tax considerations were not factors in the transaction. At trial, the litany of burdens created by the trust relationship between Placid, U.K.'s and Britannia–Hunt was presented by Michael Cuthbert ("Cuthbert"), a British solicitor retained by Britannia–Hunt.

Cuthbert testified that the arrangement between the companies was unusual given the nature of the oil development business. Because of operating agreements pertaining to the subject licenses, other parties were inadvertently involved by the severance of title. Evidence presented at trial demonstrated some general dissatisfaction with the situation by Occidental Petroleum, North Sea Sun Oil Company, and Conoco Oil Company (some of the other parties to the operating agreement).[12] The situation did not impede Placid, U.K.'s conduct of business. From the evidence presented, it appears that the separation of the legal and

---

11. In its Amended Objection to the Government's proof of claim, Placid states,

In 1986 [Britannia–Hunt] solicited bids to sell its License Interests. Because [Britannia–Hunt] was not recognized by the [Department] as a direct licensed owner, and because Ptacid[,U.K.] held legal title to [Britannia–Hunt's] interests for the benefit of [Britannia–Hunt], Placid[,U.K.] was faced with executing any sales documents and guaranteeing title in the event of a sale by [Britannia–Hunt]."

Placid's First Amended Objection to Administrative Claim at p. 9.

12. In a letter dated July 5, 1985 to Cuthbert, regarding the separation of Britannia–Hunt's legal and beneficial interests, a Sun Oil, U.K., Ltd. representative stated:

As you know, the other parties to the 16/12a Operating Agreement have expressed concern with the unusual, if not unique situation of having parties to the Operating Agreement, who are neither parties to the License nor parties to an Illustrative Agreement with a licensee. This point was discussed again at our meeting on the 2nd July, when all parties present advised Placid that the proposed transfer was unacceptable in its present form. I understand Placid are to revert to Rosewood Resources and Britannia–Hunt with a request that they come onto the License. In addition, in the case of Rosewood Resources, it was suggested that Placid could more simply dispose of a 7.2% interest and account to Rosewood Resources for any proceeds of sale, and I understand this suggestion will also be considered by Rosewood Resources.

(IRS Tr.Ex. 5).

equitable interests was tolerated by the other parties to the operating agreement because of the prior relationship between the companies arising out of the 1983 Corporate Separation.

Cuthbert testified that Placid, U.K. and Britannia–Hunt were forced to vote as a block with respect to the operating agreement. For this reason, Britannia–Hunt could not pursue its own agenda with respect to the License Interests.[13] While this may have been burdensome to Britannia–Hunt, it did not affect Placid, U.K., which notwithstanding Britannia–Hunt's divergent corporate agenda, continued to engage in exploration of its North Sea holdings. No evidence was offered that Placid, U.K. refrained from taking any action with respect to those licenses out of deference to Britannia–Hunt's desires. Cuthbert also testified that as a named licensee, Placid, U.K. was legally liable to the British Government for oil spills or environmental disasters which might have occurred. At trial the environmental liability was urged as an extreme concern. The Court notes, however, that Placid, U.K. had its own potential environmental liability and would have had a right of indemnification and contribution from Britannia–Hunt for its proportionate share. Therefore, the argument regarding the seriousness of this burden is less than convincing.

Placid, U.K., through testimony of Cuthbert and Placid, U.K.'s comptroller, Jeff Jones, urged that the separation of interests created an administrative burden for Placid, U.K. The Court finds that while it may be true that Placid, U.K. was responsible for the care and maintenance of those interests, Britannia–Hunt paid its proportionate shares of the costs generated by this arrangement. The Court is aware that inasmuch as Placid, U.K. maintained its own interests in identical leases, it is less than convincing that such administrative concerns would have been a catalyst which would lead Placid, U.K. to engage in the complicated 1986 transaction.

Placid, U.K.'s sale of its assets in 1986 can hardly be said to have occurred in the context of an arms-length transaction or as a transaction which would have occurred in the ordinary business-world. This is evidenced by Britannia–Hunt's reluctance to involve the third-party purchasers in the structure of the transaction.[14] Britannia–Hunt was not, however, timid about involving Placid, U.K., which had been substantially involved since the inception of the creation of Britannia–Hunt's ownership of those interests. Placid, U.K.'s partial motivation for its involvement in the 1986 transaction was an attempt to rectify a perceived inequity to HPC due to the corporate separation. (Placid Tr.Ex. 5; Trial Tr. p. 208–210).

Further evidence of the absence of an arms-length transaction is the fact that Placid, U.K. was not interested in selling its own assets, yet actually did so at the behest of Britannia–Hunt. With respect to the subsequent purchase of Britannia–Hunt stock, Placid, U.K., virtually insolvent at the time of the 1986 transaction, was hardly in a position to acquire the stock of another corporation. In fact, Placid, U.K. paid for the stock from funds received from the sale of its assets (Trial Tr. p. 198).

---

**13.** Britannia–Hunt wanted to cease exploration in the North Sea.

**14.** In early London solicitors discussions of the problems with the tax aspect of transaction and possible solutions:

> Although there *may* be a way of structuring the deal so as to avoid any such tax charge, it may be difficult to get the purchasers to accept such a structure. A sale of assets may therefore nonetheless have to take place[.] ... [emphasis in original]
>
> \* \* \* \* \* \*
>
> It *may* be possible to structure a deal involving BHE first transferring its license interests to three UK subsidiaries, prior to the acquisition of BHE by the purchasing companies and its subsequent liquidation. [emphasis in original] The subsidiaries holding the licenses would be transferred in the liquidation to the three parent companies, the purchasers. The precise structure of such a deal would have to be considered. However, *this course would be somewhat artificial and could be challenged by the O[il] T[axation] Office].* In any event *the purchasers may not wish to go to these lengths since the structure would directly involve them and would require their cooperation.* [emphasis added]

Placid Tr.Ex. 23, enclosure p. 1 & 6.

While Placid, U.K. asserts that it did not structure the transaction in consideration of U.S. tax consequences, it did in fact structure the transaction for United Kingdom tax avoidance. Great lengths were taken to make the sale of assets, and subsequent stock purchase, appear independent of one another in order to avoid the application of the United Kingdom "sham transaction doctrine." (Government Tr.Ex. 21, p. 7–8). It would appear that the tax laws of the United States and the United Kingdom are similar enough that Placid U.K.'s efforts to avoid British taxation should not be rewarded by allowing it to avoid United States taxes.

■ The Court does not interpret case law to say that every transaction must be profit motivated for the consequences to be tax deductible, but sound business motives must be present. For the sake of deductibility, there must be more to an undertaking than relieving another entity of a burden brought about by the creation of a trust relationship. The Court finds that Placid, U.K.'s desire to accommodate Britannia–Hunt's disposal of its License Interests, and its participation in that transaction does not give rise to a bona fide loss.

### c. The Economic Loss Analysis

■ The economic loss analysis is a common sense approach to deductibility. Courts consider whether there has been an actual economic gain or loss. This is generally put in terms of an increase or decrease in a taxpayer's net worth. Colloquially phrased, "Is the taxpayer, in fact, richer or poorer?" *Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920). The Government argues that the transaction between the corporations was not bona fide because there was no genuine economic loss. The transfer left the corporations in the same economic position as before. Assets simply shifted "from one pocket to another." The Government contends that a transfer such as this, which really left things as they were, is not an appropriate occasion for recognizing a gain or loss under the Code. In considering this issue, the Court looks at the assets sold and acquired.

It is true that Placid, U.K. sold License Interests and that Placid, U.K. acquired stock of Britannia–Hunt.

■ In acquiring the stock of Britannia–Hunt, Placid, U.K. merely acquired the exact interests in proportion to that which it sold. The clear evidence at trial establishes that the primary objective of the sale of assets and purchase of stock was that Britannia–Hunt divest its United Kingdom holdings. "A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." *Robino, Inc. Pension Trust v. Commissioner of Revenue*, 894 F.2d 342, 344 (9th Cir.1990), quoting *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). The 9th Circuit quoting *Malkan v. Commissioner*, 54 T.C. 1305, 1312–13 (1970), stated:

> Where the issue is whether an individual is acting for himself or for trusts of which he is trustee, the chronological sequence of the steps taken to accomplish a preconceived objective (here a sale) may have little to do with determining who in truth and substance made the sale.... [¶] *Our examination must focus on the realities of the transaction rather than the refinements of legal title, the verbiage of written instruments, or the chronological order of formal events.*

*Robino, Inc. Pension Trust*, 894 F.2d at 345 (emphasis added) [additional citations omitted].

A similar case to the case at bar is *Scully v. United States*, 840 F.2d 478 (7th Cir. 1988). In *Scully*, the government asserted the same argument regarding the economic outcome transaction between trusts. The simplified facts of *Scully* are these: Two trusts were controlled by the same individuals as trustees. One trust, Trust A, held land and no cash, the other trust, Trust B, possessed both cash and real property. When Trust A needed cash, Trust B agreed to purchase property from Trust A. The sale occurred at market value, in an arms-length transaction. Trust A later claimed a loss deduction arising out of a reduction

in basis. The IRS objected and disallowed the deduction under 165 and 267(b)(5).[15] At trial the trustees argued that their only motivation in the transaction was to keep the property within the family, the sale was not motivated by tax consequences, and they did not know a tax deduction would arise until well after the transaction had been completed. The opinion of the district court in favor of the government was affirmed by the 7th Circuit. The court in *Scully* found that the taxpayer failed, as it did here, to prove that actual separation in the operation of the interests at issue, and consequently, any genuine economic loss.[16]

▄▄ The Court must examine the "actualities" of a situation in determining whether the flow of economic benefits have been altered. *Scully v. U.S.*, 840 F.2d at 485. While the existence of separate legal entities cannot be disregarded, this factor "is only one incident necessary to complete an actual sale...." *Scully v. U.S.*, 840 F.2d at 485, *citing*, *Higgins v. Smith*, 308 U.S.

473, 476, 60 S.Ct. 355, 357, 84 L.Ed. 406 (1940). It appears from the evidence presented that the purchasers neither wanted, or expected to deal directly with Britannia–Hunt in purchasing the License Interests. Because the other operators refused to recognize Britannia–Hunt's ownership rights, this aspect of the sale would create problems for potential third party purchasers (see footnote 9 *supra*. and discussion of the "Sale of Rosewood License Interests" *supra*.). Placid, U.K., and Britannia–Hunt were inextricably interwound by the separation of legal and beneficial title of the License Interests. The evidence indicates that the Sun–Oxy Group dealt with Placid, U.K., as trustee of Britannia–Hunt's interests and as the named licensee. No evidence indicates that the Sun–Oxy Group believed it was purchasing Placid, U.K.'s assets.

At the inception of the disputed transactions as between third parties, Placid, U.K. represented that it was selling Britannia–Hunt's assets.[17] The necessity of papering the transactions so that they appeared to

---

**15.** 26 U.S.C. 267 provides that loss will not be recognized in sales or exchanges between related parties. Subsection (b)(3) provides that fiduciaries of two different trusts are related parties within the meaning of Section 267(a)(1) if the trusts have a common grantor. Subsection (b)(6) provides that transactions between the fiduciary of a trust and its beneficiary shall not be recognized. This provision would appear applicable to the case at bar, however, the Government did not tender this argument to the Court.

**16.** In *Scully*, the court wrote,

We have reviewed the record and can find no significant evidence of any actual separation. As the trustees admit, the purpose of the sale was to keep all the real estate in the family. The land owned by the trusts was contiguous and used a unified drainage system. There is no evidence that the tenants on the land were aware of the separate ownership by the trusts. The trustees of the trusts are the same. The trustees are brothers. All of the current beneficiaries of the trusts are the children of the trustees ... The remainder beneficiaries of the trusts are the descendants ... Most important, as the trustees admit, the purpose of the sale was to keep all of the real estate in the family and to permit the trustees to operate the land in both sets of trusts as a single, integrated economic entity. This reshuffling of assets permitted the trustees to achieve this purpose.

840 F.2d at 486.

**17.** IRS Tr.Ex. 13 is a telex from Britannia–Hunt to Sun Oil Company (U.K.) Ltd., Occidental Petroleum (Caledonia) Limited, and Grand Metropolitan Oil, Limited, which states:

WE, BRITANNIA–HUNT EXPLORATION (U.K.) LTD. (+ BHE +) ACCEPT YOUR OFFER TO PURCHASE THE PROPERTIES AND INTERESTS STATED IN SUCH LETTER WHICH ARE OWNED BY BHE. THE INTERESTS TO BE SOLD BY BHE WILL BE 16.80672/81.09244 OF THAT SET FORTH IN ITEM 1 OF YOUR LETTER. FURTHER, THE CONSIDERATION TO BE PAID BY YOU SHALL BE 16.08672/81.09244 OF [$]30,880,-000 U.S. OR [$]6,400,000 U.S. [¶] WE HAVE BEEN ADVISED BY PLACID THAT THEY DO NOT DESIRE TO SELL THEIR INTEREST AND ALSO THAT THEY HAVE NOTIFIED YOU OF THAT DECISION.

 \* \* \* \* \* \*

YOURS VERY TRULY,
TOM HUNT
PRESIDENT [HUNT ENERGY]

 \* \* \* \* \* \*

YOURS VERY TRULY,
JAMES L. PARKER
BRITANNIA–HUNT EXPLORATION (U.K.) LTD.
DALLAS, TEXAS.

be independent was recognized by the parties in the documentation of the transaction presented to the Court, it was not until May 13, 1986, that Placid, U.K., or Britannia–Hunt, actually attempted to characterize the sale as two separate transactions. That evidence is in the form of a letter from Cuthbert to the Department in which Cuthbert purported to write on behalf of all of the parties to the two transactions. Cuthbert wrote:

> ... You will note that the Party transferring the Working Interest to the Occidental Group is Placid. Shortly after this disposal occurs, Placid will acquire the entire issued stock of BHE from Hunt and BHE will therefore become a wholly owned subsidiary of Placid. This will terminate the involvement of Hunt as the indirect holder of beneficial interests in Petroleum Production Licenses in the United Kingdom....

(Placid Tr.Ex. 32). Later, Cuthbert wrote more forcefully, again to the Department:

> We would like to make clear that the interest in respect of which consent is sought ... is legally and beneficially by Placid Oil Company (United Kingdom). There is no sale by Britannia–Hunt Exploration (U.K.) Limited of any beneficial interest it holds. [¶] There will, however, be a sale of the stock of Britannia–Hunt Exploration (U.K.) Limited, in due course, to Placid Oil Company (United Kingdom).

(Placid Tr.Ex. 33).

The Court observes that oil and gas license interests are hardly dissimilar. Placid, U.K. divested itself of nothing which was in any way unique.[18] In purchasing the stock of Britannia–Hunt, Placid, U.K. intended to acquire and did acquire the same assets which were transferred to the Sun–Oxy Group.

It was argued (more forcefully by the IRS than by Placid) that Placid acquired interests in license number P301 from Britannia–Hunt and did not transfer its own interest in P301. Thus, Placid acquired more interests in the stock purchase than it sold. However, the sale of this license interest was recognized as more of a liability than an asset because the P301 license interest was the subject of ongoing litigation. In fact, had this been truly an arms-length transaction, it is unlikely that Placid, U.K. would have accepted the additional liability of the P301 license interest (See footnote 4, *supra.*).

### 2. The Step Transaction Doctrine

■ A corollary of the substance over form rule is the "step transaction" doctrine which directs courts not to focus on one segment of a complicated transaction but to look at the transaction as a whole. *Security Industrial Co. v. United States,* 702 F.2d 1234, 1244 (5th Cir.1983). The Government urges the Court apply the step transaction doctrine and consider the events as a whole rather than as two separate transactions. Generally speaking, if after viewing a transaction as a whole, the Court determines that it lacks in economic substance so as to be a sham, it will be avoided entirely through the step transaction.

■ Although, when considered individually, each step in a series of interrelated transactions may escape taxation, individual tax significance of each step is irrelevant

---

**18.** In the context of economic realities, compare the Fifth Circuit's discussion in the context of realization provisions under the Revenue Code and its criticism of the analysis that realization is only concerned with fixing gain or loss at a given time, whereas the nonrecognition sections of the code are concerned with analyzing the substance of a transaction. The court notes that a practical problem may result from this analysis. This method may result in placing limitations on realization through meaningless exchanges:

> Realization of gain or loss would occur if farmer A exchanged 1,000 bushels of Kansas spring wheat with farmer B for 1,000 bushels of Kansas spring wheat or if individual C exchanged his 1969 red Ferrari with individual D's 1969 red Ferrari (of the same model), both of which had been garaged and never driven. As [the taxpayer] acknowledges, this doctrine would lead to deduction of the losses sustained on these transactions absent a specific Code non-recognition provision.

*San Antonio Sav. Ass'n v. C.I.R.,* 887 F.2d 577, 583 (5th Cir.1989) (where taxpayer sought recognition of loss on exchanges of loans between savings and loans).

under the step-transaction doctrine if steps when viewed as a whole amount to a single taxable transaction. *Security Industrial Insurance Company v. United States*, 702 F.2d 1234 (5th Cir.1983).

■ Two analyses have been utilized to determine if the step transaction doctrine should be applied to circumstances of taxation: (1) The "interdependence test" which requires an inquiry as to "whether on a reasonable interpretation of the objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without the series;" [citation omitted] or "[w]hen it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts,"; and (2) the "end result test" which establishes a standard whereby "purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *Security Industrial Insurance Company*, 702 F.2d at 1244 [additional citations omitted].[19] If the facts apply to the above standards, application of the step transaction may be deemed appropriate. *Security Industrial Insurance Company*, 702 F.2d at 1245. Applying either standard, the Court concludes that Placid may not claim a deduction of its 1986 sale of assets.

■ In applying the "interdependence" standard, it is unlikely that any one step would have been undertaken except in contemplation of the others. Placid, U.K. executed a sales agreement with the Sun–Oxy Group on July 11, 1986, and three days later, July 14, 1986, entered into a stock purchase agreement with Britannia–Hunt, a beneficial interest holder in exactly the same proportionate share in License Interests as those which Placid, U.K. had previ-

ously divested. More importantly, while Placid, U.K. had no desire to sell its own assets, it was interested in aiding Britannia–Hunt's disposal of its assets.

The characterization of the transaction as a sale of license interests and purchase of stock was mere legal fiction designed for the one ultimate outcome—Britannia–Hunt's disposal of its North Sea License Interests. Placid, U.K. indicated at trial that it would not have sold its own assets without the contemplated purchase of stock of Britannia–Hunt to acquire Britannia–Hunt's License Interests which were identical to those sold. The contracts evidencing the transaction between the parties are void of any cross-reference. This fact alone suggests self-contained and independent transactions. However, the contracts were written in that way intentionally, to avoid the potential application of the United Kingdom sham transaction doctrine. (Placid Tr.Ex. 23)

■ In applying the "end result" standard, "purportedly separate transactions are to be amalgamated when the successive steps were designed and executed as part of a plan to achieve an intended result." *Security Industrial Insurance*, 702 F.2d at 1246. It is uncontroverted that the ultimate outcome was the result intended from the outset. Although Placid, U.K. did sell its own assets, it later acquired the same proportion in the same assets as sold. The transaction was a relatively uncomplicated two-step transaction, to reach the intended result which was Britannia–Hunt's divestiture of its North Sea oil and gas interests. The machinations devised to avoid the application of British taxes do not change the result for United States tax purposes. See *Security Industrial Insurance*, 702 F.2d at 1246, citing, *Minnesota Tea Co. v. Helverling*, 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474 (1938).

---

19. There is a third test, called the "binding commitment test," which is the most restrictive of the three tests. It has been rejected by the Supreme Court, the 5th Circuit and the 7th Circuit, except in extremely narrow circumstances. Under the binding commitment analysis, if one step is to be characterized as a "first step" there must be a binding commitment to take the later step. The binding commitment test requires telescoping several steps into one transaction only if a binding commitment existed as to the second step at the time the first step was taken. *See Security Industrial Insurance*, 702 F.2d at 1244.

### 3. Additional Observations

■ The Court, having reached its conclusion on under the sham transaction and step transaction doctrines, need not address additional issues asserted respect to the taxation issue. However, both the Government and the Debtor asserted arguments that are rather curious. The IRS argues that to further preclude the debtor's deduction is the debtor's own financial accounting method which treated the sale and subsequent purchase of Britannia stock as a "wash" and later treated the sale as a loss for its accounting purposes. The IRS cited *Thor Power Tool v. Commissioner of Internal Revenue,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1978), as authority prohibit the debtor from using a different method of accounting with respect to its financial and tax accounting purposes. At the outset, the Court finds the language and facts of *Thor Power Tool* inapposite to the case at bar and further notes that an identical argument was made in by the government in *First Federal Savings & Loan Association of Temple v. United States of America,* 694 F.Supp. 230 (W.D.Tex.1989), aff'd by *San Antonio Sav. Assn. v. Commissioner of Internal Revenue,* 887 F.2d 577 (5th Cir.1989). The District Court summarily rejected the government's argument saying:

> Typically, this section has been used by the I.R.S. to require a taxpayer to use a different method of accounting for tax purposes than he uses for financial or regulatory purposes when the I.R.S. (the 'Commissioner') is of the opinion that the change is required to clearly reflect the taxpayer's income. Thus, the taxpayer would use different methods of accounting on its 'books' and on its tax return at the direction of the I.R.S. pursuant to the authority granted under Section 446. [¶] Here, however, the Government urges a rather novel interpretation of Section 446 which presents the Court with an issue of first impression. First, the Government argues that the 'accounting method' a taxpayer uses on his financial and regulatory books may differ from the method he uses in computing his taxable income only when the Commissioner requires it (i.e. the Commissioner determines that the taxpayer's financial and regulatory accounting method does not 'clearly reflect income'). [footnote omitted] The government goes on to contend, therefore, that [the taxpayer] must use the same accounting treatment for the loss at issue for both tax and financial reporting purposes unless the Commissioner explicitly instructs it not to do so by concluding that the financial accounting treatment of the claimed loss does not clearly reflect [the taxpayer's] income.

The Court agrees with the findings of Judge Smith and rejects the contention of the IRS on the same grounds.

Placid argues that it would not have been able to utilize a deduction at all except in bankruptcy. As authority for this assertion, Placid cited *United Savings Assn. of Texas v. Timbers of Inwood Forest Assoc.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The Court has carefully read *Timbers* in an effort to determine the basis of the Debtor's argument and has found nothing in that case to support Placid's assertion. Placid did not offer any additional explanation of its legal reasoning in its brief. The Court determines that *Timbers* is not applicable to this case.

## V. CONCLUSION

The Court finds that in considering the transaction, Placid, U.K. incurred no loss on the sale of the license interests. The record reveals that Placid, U.K. had an no real economic purpose in the sale of its own License Interests except to facilitate Britannia–Hunt's total divestment of its North Sea Holdings. Placid, U.K.'s role became relevant because of the separation of the legal and equitable interests in the License Interests, but became crucial when British taxation became an issue. The potential buyers were reluctant to purchase the stock of Britannia, and Britannia–Hunt was reluctant to sell its License Interests outright because of its basis in the License Interests. To facilitate the sale, Placid, U.K., with no reservations about purchasing Britannia–Hunt's stock, acted as a ve-

hicle between Britannia–Hunt and the Sun–Oxy group.

The record reveals that Placid, U.K. first sold its 16.8% of the license interests to the Sun–Oxy group for $6.4 million and then used the proceeds to purchase the stock of Britannia–Hunt. In so doing, Placid, U.K., within approximately 72 hours, by a preexisting agreement with Britannia–Hunt, reacquired what it had sold. The direct and intended result of this transaction was Placid, U.K.'s regaining control of the 16.8% License Interests it had previously conveyed to the Sun–Oxy Group.

In consideration of the substance of this transaction and applying standards set forth by the 5th Circuit with respect to the step transaction doctrine the Court finds that this transaction does not give rise to a bona fide loss such that Placid, U.K or its parent, Placid Oil Company should be entitled to a deduction.

The Court finds IN FAVOR of the Internal Revenue Service. Counsel for the Government is requested to prepare an Order consistent with the findings herein.